# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL L. GARN, | ) | CASE NO. 1:20-CV-00465-JGC |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G.CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| WARDEN JAMES HAVILAND, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant, | ) | |

## I.    INTRODUCTION

Michael L. Garn ("Garn") seeks a Writ of Habeas Corpus under 28 U.S.C. § 2254 and asserts five grounds for relief. (ECF Doc. 1). Garn, who is currently an Ohio inmate and was previously a police officer, is currently serving a 12.5-year prison term for menacing by stalking, unauthorized use of property, tampering with evidence, and sexual battery. Respondent Warden James Haviland ("Respondent") filed a Return of Writ. (ECF Doc. 7). Garn filed a Traverse. (ECF Doc. 14). This matter is before me[1] by an automatic order of reference under Local Rule 72.2 for preparation of a report and recommendation on Garn's petition and other case-dispositive motions. For the reasons set forth in detail above, I RECOMMEND that the Court deny and/or dismiss all of Garn's claims.  I further recommend that the Court deny Garn a certificate of appealability.

---

[1] This matter was originally before Magistrate Judge William H. Baughman, Jr. pursuant to an automatic order of reference. Due to Magistrate Judge Baughman's retirement, this case was referred to me pursuant to General Order 2022-14 on September 2, 2022.
.

## II.     RELEVANT FACTUAL BACKGROUND

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts "shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); *see also Spagnola v. Horton*, No. 17-1462, 2017 WL 8948745, at *2 (6th Cir. 2017). The Ohio Court of Appeals for the Fifth District set forth the following facts on direct appeal:

[*P2]  At all times relevant, Appellant was employed as a police officer with the Mansfield Police Department. As part of his job responsibilities, Appellant was assigned to traffic enforcement detail, including the STEP detail (Selective Traffic Enforcement Program) as an overtime detail.

[*P3]  Appellant was certified in the use of the Law Enforcement Automated Database System (LEADS), and completed recertification tests, scoring high percentages. Appellant testified at trial he ran LEADS searches routinely as part of his traffic enforcement duties. Appellant testified he understood LEADS could not be used for an unlawful purpose or for personal gain.

[*P4]  On February 26, 2015, in Case No. 2015CR197, the Richland County Grand Jury indicted Appellant on 17 counts of LEADS violations, 14 counts of dereliction of duty, one count of burglary, one count of trespass, one count of attempted gross sexual imposition, one count of attempted sexual battery, one count of menacing, two counts of tampering with evidence, one count of sexual battery, and one count of public indecency. On July 10, 2015, the Richland County Grand Jury indicted Appellant on one count of menacing by stalking, in violation of R.C. 2903.211(A)(1), in case number 2015 CR 637. On July 24, 2015, the trial court joined 2015 CR 197 with the indictment in 2015 CR 637.

[*P5]  On March 25, 2016, Appellant moved the trial court to dismiss the LEADS violation charges as being unconstitutionally vague. The State filed a response to the motion. Via Judgment Entry of March 31, 2016, the trial court denied Appellant's motion to dismiss the LEADS violations.

[*P6]  Following a jury trial, Appellant was convicted of 12 counts of unauthorized use of LEADS, in violation of R.C. 2913.04(C), a fifth degree felony (Counts 3, 5, 6, 9-17); 11 counts of dereliction of duty, in violation of R.C. 2921.44(E), a misdemeanor of the second degree (Counts 19, 22-29, 31); one count of tampering with evidence, in violation of R.C. 2921.12(A)(1), a third degree felony (Count 37); and one count of sexual battery, in violation of R.C. 2907.03(A)(1) (Count 39). Appellant was also convicted of one count of

2

menacing by stalking, in violation of R.C. 2903.211(A)(1), in Case No. 2015 CR 637.

[*P7] The trial court entered sentence on April 20, 2016, imposing a twelve month prison term on Counts 3, 5, 6, 9, 10, 11, 12, 13, 14, 15, 16, and 17. The trial court found counts 19, 22, 23, 24, 25, 26, 27, 28, 29, and 31 merged with Appellant's sentence on other counts. The trial court imposed a thirty-six month prison term on count 37 (tampering with evidence), and a 60 month prison term on count 39 (sexual battery). The trial court ordered the sentences on counts 3, 15, 16, 37, 39 and the sentence imposed in case number 2015 CR 637 run consecutively, and the other remaining counts run concurrently. The trial court classified Appellant a Tier III sex offender for his conviction on a sexually oriented offense. Via separate Sentencing Entry in 2015 CR 637, the trial court sentenced Appellant to eighteen months in prison on the conviction for menacing by stalking, to run consecutive to Appellant's sentence in 2015 CR 197, for a total sentence of 12 1/2 years in prison.

*State v. Garn*, 2017-Ohio-2969, ¶¶ 2-7, 91 N.E.3d 109, 111-13 (Ct. App.).

## III.    RELEVANT STATE PROCEDURAL HISTORY

### A.  <u>State Convictions</u>

On February 26, 2015, a Richland County Grand Jury issued a 40-count indictment charging Garn with 17 counts of unauthorized use of Ohio Law Enforcement Gateway and/or unauthorized use of the Law Enforcement Automated Database System ("LEADS") (Counts 1 to 17); 14 counts of dereliction of duty (Counts 18 to 31); one count of burglary (Count 32); one count of trespass into a habitation (Count 33); one count of attempted gross sexual imposition (Count 34); one count of attempted sexual battery (Count 35); one count of menacing by stalking (Count 36); two counts of tampering with evidence (Counts 37 to 38); one count of sexual battery (Count 39); and one count of public indecency (Count 40). (ECF Doc. 7-1, Ex. 1, PageID#158-69). Garn pleaded not guilty to all charges in Case No. 2015 CR 0197 (*Id.*, Ex. 2, PageID#170). On July 10, 2015, a Richland County Grand Jury further charged Garn in an indictment with one count of menacing by stalking in Case No. 2015 CR 0637. (*Id.*, Ex. 4, PageID#173-74). Garn pleaded not guilty. (*Id.*, Ex. 5, PageID#175).

Garn filed a motion to dismiss Counts 18 to 21 in the first case, arguing that the court no longer had jurisdiction over the charges of dereliction of duty because the statute of limitations had expired. (*Id.*, Ex. 3, PageID#171-72). The State submitted a response concurring with Garn's argument that Counts 18, 20, and 21 should be dismissed on statute of limitations grounds. (*Id.*, Ex. 6, PageID#180). However, the State argued that Count 19 should not be dismissed because it was within the statute of limitations. The State also requested that the two cases be consolidated. (*Id.*, Ex. 6, PageID#176-81).

The trial court granted Garn's motion to dismiss Counts 18, 20, and 21, and any portion of Count 19 that fell outside the statute of limitations (*Id.*, Ex. 7, PageID#182-86). The trial court also granted the State's motion to join Case Nos. 2015 CR 0197 and 2015 CR 0637 for the purposes of trial. (*Id.*, Ex. 8, PageID#187).

Garn moved to dismiss Counts 1 to 17, arguing that the statute for the charges of unauthorized use of LEADS was vague and violated the separation of powers doctrine. (*Id.*, Ex. 9, PageID#188-201). The trial court denied Garn's motion. (*Id.*, Ex. 10, PageID#202-07). Prior to trial, the State dismissed Counts 7 and 8 without prejudice. (*Id.*, Ex. 11, PageID#208-10).

The case proceeded to trial, and the jury found Garn guilty in Case No. 2015 CR 0197 of 12 counts of unauthorized use of Leads (Counts 3, 5, 6, 9, 10, 11, 12, 13, 14, 15, 16, 17); 11 counts of dereliction (Counts 19, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31); one count of tampering with evidence (Count 37); and one count of sexual battery (Count 39). The jury also found Garn not guilty of all remaining counts. In Case No. 2015 CR 0637, the jury found Garn guilty of one count of menacing by stalking.

At a sentencing hearing on April 19, 2016, the trial court merged the following counts for purposes of sentencing: Count 19 with Count 6; Count 22 with 39; Count 23 with Count 10; Count

4

24 with Count 11; Count 25 with Count 12; Count 26 with Count 13; Count 27 with Count 14; Count 28 with Count 15; Count 29 with Count 16; and Count 31 with Count 37. The trial court then sentenced Garn to: (1) 12 months of incarceration on Counts 3, 5, 6, 9, 10, 11, 12, 13, 14, 15, 16, and 17; (2) 36 months on Count 37; (3) 60 months on Count 39; and (4) 18 months for the menacing by stalking charge in Case No. 2015 CR 0637. Counts 3, 15, 16, 37, and 39 were ordered to be served consecutively to each other and consecutively to Case No. 2015 CR 0637, which resulted in an aggregate sentence of 12.5 years. (*Id.*, Ex. 12, PageID#210-212; Ex. 13, PageID#213-15). Garn was also found to be a Tier III sex offender/child victim offender. (*Id.*, Ex. 14, PageID#216-17).

### B. Direct Appeal

On May 17, 2016, Garn filed a timely notice of appeal in Case No. 2015 CR 0197 to the Ohio Court of Appeals for the Fifth District. (*Id.*, Ex. 15, PageID#218). Garn then filed an untimely notice of appeal in Case No. 2015 CR 0637 (*Id.*, Ex. 16, PageID#223), as well as a motion for leave to file delayed appeal requesting the two appeals be consolidated (*Id.*, Ex. 7, PageID#228-35). The court granted both motions. (*Id.*, Ex. 8, PageID#236). Garn raised the following assignments of error in his direct appeal:[2]

**Assignment of Error No. 1:** Defendant's convictions for violation of the Law Enforcement Automated Database System (LEADS) statute and for dereliction of duty in that regard violated his rights to due process under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution, on the grounds that the statute is unconstitutional.

**Assignment of Error No. 2:** The Defendant's conviction for violation of the LEADS statute is based upon insufficient evidence, and against the manifest weight of the evidence, in violation of the Defendant's right to due process under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

---

[2] Garn's assignments of error asserted in his direct appeal to the Fifth District Court of Appeals are set forth verbatim herein, including certain typographical and/or grammatical errors.

**Assignment of Error No. 3:** The trial court erred in excluding evidence of Krystal Sawyer's prison discipline record regarding a false allegation of sexual activity, to the prejudice of Defendant's right to confront witnesses and present a defense under the Sixth and Fourteenth Amendments to the United States Constitution, and Article 1, Section 10 and Article I, Section 16 of the Ohio Constitution.

**Assignment of Error No. 4:** The Defendant's conviction for tampering with evidence is based upon insufficient evidence, and against the manifest weight of the evidence, in violation of Defendant's right to due process under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

**Assignment of Error No. 5** The Defendant's conviction for menacing by stalking is based upon insufficient evidence, and against the manifest weight of the evidence, in violation of Defendant's right to due process under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

(*Id.*, Ex. 19, PageID#275-304). The State filed a response brief (*Id.*, Ex. 20, PageID#305-19). Garn replied. (*Id.*, Ex. 21, PageID#305-19).

On May 19, 2017, the Fifth District Court of Appeals overruled all of Garn's assignments of error and affirmed the trial court's judgment. (*Id.*, Ex. 22, PageID#320-50).

On July 3, 2017, Garn, through counsel, filed a notice of appeal with the Ohio Supreme Court. (*Id.*, Ex. 23, PageID#351-52). In his merit brief, Garn raised the following propositions of law:[3]

**Proposition of Law No. 1:** Ohio's Rape Shield statute must be read in conjunction with a defendant's 6th Amendment right to confrontation and to present a defense. In determining whether the defense should be permitted to cross-examine sexual assault complaint about a prior false accusation of rape, the court must balance the state interest which the Rape shield statute is designed to protect against the probative value of the evidence of a prior false allegation of sexual assault. (*State v. Williams*, 21 Ohio St.3d 33, 487 N.E.2d 560 (1986), and *State v. Boggs*, 63 Ohio St.3d 418, 588 N.E.2d 813 (1992), harmonized.)

**Proposition of Law No. 2:** The LEADS statute, R.C. §2913.04(C) and (D), is unconstitutionally void for vagueness, and violates the separation of powers doctrine.

---

[3] Garn's propositions of law asserted in his direct appeal to the Ohio Supreme Court are set forth verbatim herein, including certain typographical and/or grammatical errors.

(*Id.*, Ex. 24, PageID#353-376). The State filed a memorandum opposing jurisdiction. (*Id.*, Ex. 25, PageID#377-95). On February 22, 2018, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct.Prac. R. 7.08(B)(4). (*Id.*, Ex. 26, PageID#396).

### C. App. R. 26(B) Application to Reopen

On August 17, 2017, Garn, through counsel, filed with the trial court a timely application to reopen his direct appeal, alleging his appellate counsel's performance was constitutionally deficient. (*Id.*, Ex. 27, PageID#397-410). He raised the following three assignments of error his counsel failed to raise in direct review:[4]

> **First Assignment of Error:** The Trial Court erred by improperly sentencing Mr. Garn to maximum, consecutive prison terms in contravention of Ohio's sentencing statutes.
>
> **Second Assignment of Error:** Appellant was denied his Sixth Amendment right to the effective assistance of counsel because trial counsel did not renew her Motion to Dismiss after the close of the State's case.
>
> **Third Assignment of Error:** Appellant was denied his Sixth Amendment right to effective assistance of counsel because trial counsel did not file a motion to sever the charges for trial.

(*Id.*). The State opposed Garn's motion. (*Id.*, Ex. 28, PageID#411-24). On October 12, 2017, Garn's application to reopen was overruled. (*Id.*, Ex. 29, PageID#425-31).

On December 1, 2017, the Fifth District Court of Appeals denied Garn's application for reconsideration (ECF Doc. 7-1, Ex. 30, PageID#432-35. (*Id.*, Ex. 31, PageID#436-37). Garn did not seek further appellate review to the Ohio Supreme Court.

---

[4] Garn's assignments of error asserted in his 26(B) application are set forth verbatim herein, including certain typographical and/or grammatical errors.

### D. **Post-Conviction Petition**

On September 5, 2007, Garn, through counsel, filed a post-conviction petition pursuant to R.C.

§ 2953.21, raising the following claims for relief:[5]

> **First Claim for Relief:** The convictions and sentences against Petitioner Garn are
> void and/or voidable because the Richland County Prosecutor's Office failed to
> provide trial counsel with favorable and exculpatory evidence.

> **Second Claim for Relief:** Petitioner Garn's convictions are void and/or voidable
> because Petitioner was denied a fair trial because of the failure of the prosecutor to
> provide him with favorable evidence as required by the Fifth, Sixth, and Fourteenth
> Amendments to the United States Constitution.

> **Third Claim for Relief:** The ineffectiveness of trial counsel for the defense
> violated the standards set forth in Strickland v. Washington and denied Petitioner
> Garn of his Fifth, Sixth, and Fourteenth Amendments Rights as guaranteed by the
> United States Constitution.

(*Id.*, Ex. 36, PageID#448, 457, 461). The State opposed Garn's post-conviction motion. (*Id.*, Ex.

33, PageID#495-500).

The trial court conducted a four-day hearing on Garn's post-conviction motion, and

permitted both parties to submit post-hearing briefs. (*Id.*, Exs. 34-35, PageID#510-49). On July

17, 2018, the court overruled Garn's petition for post-conviction relief. (*Id.*, Ex. 36, PageID#550-

601).

Garn filed a timely notice of appeal to the Fifth District Court of Appeals. (*Id.*, Ex.37,

PageID#602). In his brief, he raised the following assignment of error:[6]

> **Assignment of Error 1:** The trial court abused its discretion in denying Petitioner's
> petition for post conviction relief.

---

[5] Garn's claims for relief asserted in his post-conviction petition are set forth verbatim herein, including certain
typographical and/or grammatical errors.
[6] Garn's assignment of error asserted in his brief is set forth verbatim herein, including certain typographical and/or
grammatical errors.

(*Id.*, Ex. 38, PageID#676-92). The State responded. (*Id.*, Ex. 39, PageID#747-86). Garn replied. (*Id.*, Ex. 41, PageID#788-804). On April 29, 2019, the appellate court affirmed the trial court's decision, finding that Garn had failed to present evidence sufficient to undermine confidence in the verdict, and overruled Gole's assignment of error. (ECF Doc. 7-1, Ex. 42, PageID#805-41).

On June 11, 2019, Garn, through counsel, filed a notice of appeal with the Ohio Supreme Court. (*Id.*, Ex. 43, PageID#842-44). In his memorandum in support of jurisdiction (*Id.*, Ex. 44, PageID#845-916), Garn raised the following proposition of law:[7]

> **Proposition of Law 1:** A defendant is deprived of a fair trial in violation of the Sixth Amendment, and Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution where the State withholds material, exculpatory evidence.

(*Id.*, Ex. 44, PageID#845). The State filed a memorandum in opposition to jurisdiction. (*Id.*, Ex. 45, PageID#917-30). On August 6, 2019, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4). (*Id.*, Ex. 46, PageID#931).

## IV.    FEDERAL HABEAS PETITION

On February 28, 2020, Garn, through counsel, filed the instant Petition for habeas corpus pursuant to 28 U.S.C. § 2254. (ECF Doc. 1). In his Petition, Garner asserts the following five grounds for relief:[8]

> **Ground One:** Sixth Amendment Right to Confront Witnesses and Right to Raise a Defense
>
> **Ground Two:** Ohio's Unauthorized Use of Law Enforcement Data System is Violative of the Constitution for Vagueness and Separation of Powers
>
> **Ground Three:** Favorable Materials Withheld by State in Violation of Brady and Napue

---

[7] Garn's proposition of law asserted in his appeal to the Ohio Supreme Court is set forth verbatim herein, including certain typographical and/or grammatical errors.

[8] Garn's grounds for habeas relief asserted in his Petition are set forth verbatim herein, including certain typographical and/or grammatical errors.

**Ground Four:** Ineffective Assistance of Counsel for Failure to Investigate

**Ground Five:** Cumulative Errors Denied Due Process

(ECF Doc. 1, PageID#6-11; ECF Doc. 1-2, PageID#71).[9]

## V.     LEGAL STANDARDS

### A.  Jurisdiction

28 U.S.C. § 2254(a) authorizes this court to entertain an application for a writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court." A state prisoner may file a § 2254 petition in the "district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him" 28 U.S.C. § 2241(d). The Court of Common Pleas of Richland County sentenced Garn, and the Court takes judicial notice that Richland County is within this court's geographic jurisdiction. Accordingly, this Court has jurisdiction over petitioner's § 2254 petition.

### B.  AEDPA Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs Garn's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009). AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases," and "'to further the principles of comity, finality, and federalism[.]'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 420, 436 (2000)). The Act "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id*.

---

[9] Garn's memorandum in support of his Petition switches his first and second grounds for relief. For consistency, this Report and Recommendation will keep these numbers as listed in his actual Petition.

One of AEDPA's most significant limitations on district courts' authority to grant writs of habeas corpus is found in § 2254(d). That provision prohibits federal habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis in original). A state court has adjudicated a claim "on the merits[,]" and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision. *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

"Clearly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes only "'the holdings, as opposed to the dicta, of [Supreme Court] decisions.'" *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012)). The state court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). A state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

11

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). And "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state court's determination of fact is unreasonable under § 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18 (quoting § 2254(e)(1)); *see also Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). "This standard requires the federal courts to give considerable deference to state court decisions." *Ferensic v. Birkett*, 501 F.3d 469, 472 (6th Cir. 2007). The Supreme Court has cautioned, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt*, 571 U.S. at 18 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

Indeed, the Supreme Court has repeatedly emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state court adjudications of federal claims. The Supreme Court has admonished that a reviewing court may not "treat[] the unreasonableness question as a test of its confidence in the result it would reach under de novo review[,]" and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination

12

was unreasonable – a substantially higher threshold."). Rather, § 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,'" and does not function as a "substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03, *quoting Jackson*, 443 U.S. at 333 n.5 (Stevens, J., concurring in judgment). Thus, a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. The Supreme Court readily acknowledges that this is a very high standard, observing that: "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

### C. <u>Exhaustion and Procedural Default</u>

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court can review a petition for a writ of habeas corpus on the merits. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982). It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). It occurs when a habeas petitioner fails to obtain

consideration of a federal constitutional claim by state courts because he failed to: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See generally Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806. In determining whether there has been a procedural default, the federal court again looks to the last explained state-court judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).

A claim is fairly presented when it has been asserted as a federal constitutional issue at every state of the state court review process. *Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 285 (6th Cir. 2010); *Williams*, 460 F.3d at 806.

Procedural default, however, can be excused and will not preclude consideration of a claim on federal habeas review if the petitioner can demonstrate: (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law;" or (2) "failure to consider the claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). A "fundamental miscarriage of justice" can occur only when the procedurally defaulted claim – supported by new reliable evidence not presented at trial – would establish that the petitioner was "actually innocent" of the offense. *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

### D. **Actual Innocence**

In *Schlup v. Delo*, 513 U.S. 298, 314-315, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995), the Supreme Court held that a habeas petitioner who makes a "colorable showing of factual innocence" that would implicate a "fundamental miscarriage of justice" may be entitled to have "otherwise barred constitutional claim[s] considered on the merits." This exception is concerned

with actual - as opposed to legal - innocence and must be based on reliable evidence not presented at trial. *Schlup,* 513 U.S. at 324; *Calderon v. Thompson,* 523 U.S. 538, 559 (1998). In such cases, a petitioner must "support his allegations of constitutional error with new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." *Schlup,* 513 U.S. at 324.

### E.  Cognizable Federal Claim

A petition for a writ of habeas corpus filed by a petitioner imprisoned under the judgment of a state court is governed by 28 U.S.C. § 2254(a), which permits the state prisoner to challenge his custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *Id.* To say that a petitioner's claim is not cognizable on habeas review is another way of saying that his claim "presents no federal issue at all." *Bates v. McCaughtry*, 934 F.2d 99, 101 (7th Cir. 1991). Federal habeas corpus relief "does not lie for errors of state law[.]" *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), and the federal court is bound by the state court's interpretations of state law. *See, e.g.*, *Wainwright v. Goode*, 464 U.S. 78, 84 (1983). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (citing *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987). "[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure" in considering a habeas petition. *Allen*, 845 F.2d at 614 (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)).

### VI.    ANALYSIS

### A.  Ground One: Sixth Amendment Right to Confrontation and Right to Raise a Defense

Garn's Ground One claim contends that he was denied his Sixth Amendment right to confront witnesses and present a defense because the trial court prohibited him from inquiring

about Ms. Krystal Sawyer's ("Sawyer" or "Ms. Sawyer") prior false allegations of sexual assault. He contends that the trial court never considered the balancing test required by *State v. Gardner*, 59 Ohio St.2d 14, 391 N.E.2d 337 (1979), meaning that the court never considered the application of his Sixth Amendment rights to Ohio's rape shield statute.  For the reasons set forth below, this claim fails.

The Confrontation Clause protects a defendant's right to cross-examine witnesses. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). This right is not absolute; in fact, the Constitution guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (emphasis in original). Moreover, "trial judges retain wide latitude … to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Where a trial court limits a defendant's cross-examination in a manner that infringes upon the protections afforded by the Confrontation Clause, the court must balance the limitation against "the competing interests at stake." *Lewis v. Wilkinson*, 307 F.3d 413, 421 (6th 2002). Ohio's rape shield law provides:

> Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

R.C. §2907.02(D).

16

In *State v. Gardner*, 59 Ohio St.2d 14, 17-18 (1979), the Ohio Supreme Court explained the state interests that the rape shield law advances:

> First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process.

*Id.* When testimony barred by the rape shield law is sought to be used only to challenge the witnesses' general credibility, there is no Confrontation Clause violation. *Jordan v. Warden, Lebanon Corr. Inst.*, 675 F.3d 586, 596 (6th Cir. 2012) (citing *Boggs v. Collins*, 226 F.3d 728, 737-38 (6th Cir. 2000)).

The Fifth District Court of Appeals assessed Garn's constitutional challenge to the application of Ohio's rape shield statute to prohibit the admission of Sawyer's testimony regarding prior sexual activity and determined the following:

> {¶ 64} In the third assignment of error, Appellant argues the trial court erred in prohibiting evidence as to a witness' prior false allegation of sexual assault.

> {¶ 65} Krystal Sawyer testified at trial Appellant came to her home to investigate the theft of socks from Family Dollar. She testified Appellant indicated he would not proceed with the investigation, if she performed sexual acts. Sawyer testified she engaged in fellatio with Appellant, so she wouldn't have to go to jail.

> {¶ 66} At trial, Appellant sought to introduce evidence Sawyer previously plead guilty to making a false allegation of sexual assault while in prison. The trial court conducted a voir dire interview of Sawyer, and excluded the evidence.

> {¶ 67} Evidence Rule 608(B) provides,

> > (B) Specific Instances of Conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness, or (2) concerning the

17

character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

{¶ 68}  In *State v. Boggs,* 63 Ohio St.3d 418, 588 N.E.2d 813 (1992), the Ohio Supreme Court held,

> False accusations, where no sexual activity is involved, do not fall within the rape shield statute. Therefore, a defendant is permitted under Evid.R. 608(B), in the court's discretion, to cross-examine the victim regarding such accusations if "clearly probative of truthfulness or untruthfulness." However, the defendant will be bound by the answers given by the victim. See, *e.g., State v. Gardner, supra,* 59 Ohio St.2d [14] at 19, 13 O.O.3d [8] at 11, 391 N.E.2d [337] at 341 [ ( 1979) ]. Thus, if defense counsel inquires of an alleged rape victim as to whether she has made any prior false accusations of rape, and the victim answers no, the trial court would have the discretion to determine whether and to what extent defense counsel can proceed with cross-examination. However, if the alleged victim answers in the affirmative, the trial court would have to conduct an *in camera* hearing to determine whether sexual activity had been involved. If the trial court determined that the accusations were entirely false (that is, that no sexual activity had been involved) the trial court would then be permitted to exercise its discretion in determining whether to permit defense counsel to proceed with cross-examination of the alleged victim. We therefore hold that where an alleged rape victim admits on cross-examination that she has made a prior false rape accusation, the trial judge shall conduct an *in camera* hearing to ascertain whether sexual activity was involved and, as a result, would be prohibited by R.C. 2907.02(D), or whether the accusation was totally unfounded and therefore could be inquired into on cross-examination pursuant to Evid.R. 608(B).

> But, as noted above, under no circumstances would the defense be permitted to introduce extrinsic evidence. Evid.R. 608(B). The reason for this is that "a witness may not be impeached by evidence that merely contradicts his testimony on a matter that is collateral and not material to any issue in the trial." *Byomin v. Alvis* (1959), 169 Ohio St. 395, 396, 8 O.O.2d 420, 421, 159 N.E.2d 897, 989 [898]. Moreover, we held in *State v. Kamel* (1984), 12 Ohio St.3d 306, 12 OBR 378, 466 N.E.2d 860, at paragraph two of the syllabus, that "[o]ther than the Evid.R. 609 exception for certain criminal convictions, a witness' credibility may not be impeached by extrinsic proof of specific instances of his conduct. Such conduct may be inquired into only by the intrinsic means of cross-examination within the guidelines set forth in Evid.R. 608(B)."

{¶ 69}  Unless the party offering the evidence demonstrates that "the accusations were totally false and unfounded" and that no sexual activity took place, the rape shield law bars further inquiry. *Id.* at 423, 588 N.E.2d 813.

18

{¶ 70} During the trial proceedings, the following exchange occurred on the record, outside of the presence of the jury,

> MS. CORRAL: Yes, Your Honor. We have a record from the institution that she was charged with a violation for making a false report of sexual assault. She did plead guilty to that violation. There's a notation in here that she admitted to fabricating the allegation. We understand that we can't get into whether or not sexual contact occurred, and we have no interest in getting into that. Rape shield protects that, and we respect that boundary. But I do believe or think we should be permitted to inquire as to whether this false allegation actually occurred.
>
> * * *
>
> THE COURT: I did some research on this prior, because I knew this was going to be an issue. What I found was there's a couple cases, *State v. Cheney* and *State v. Boggs*, and Evidence Rule 608 B. Evidence Rule 608 B and the case law I found says the defense can ask about a prior false allegation of rape, or something like that, but they would be stuck with the answer if the victim denied it. So if the victim said, I never made a false allegation, you're not going to be able to bring in extrinsic evidence of it.
>
> If she does admit it and says yes, I did make a false allegation, the Court's supposed to determine if any sexual activity actually did occur. Because if there was sexual activity, again, we've got rape shield law that would block that. But if there was no sexual activity at all, then I think she can be crossed on it, but no extrinsic evidence can be introduced. So in other words, you ask the question, but you can't use the RIB information to support it.
>
> So what's going to have to happen is we're going to have to talk to her outside the presence of the jury. We're going to have to ask her if she ever had made it. Again, if she denies it, I believe you're stuck with that answer. If she says, yes, I made a false sexual—made a false allegation, then we need to know if there was any sexual activity that occurred at all. If the answer is no, she just made it up, then you can cross on it. But, again, you can't bring in extrinsic evidence to prove that.
>
> * * *
>
> THE COURT: Krystal, go ahead and have a seat. I'm Judge Brent Robinson. Before you testify, there's a couple things I have to ask you to make a ruling on whether or not you can be asked some questions when you're testifying. There's a question about whether or not you ever made a false allegation. I think this relates to when you were in prison, whether you ever made a false allegation that some sexual activity happened with you and another inmate.

So the question will be, did you—have you made a prior allegation like that that wasn't true?

MS. SAWYER: No.


THE COURT: Okay. So the allegation or what you said happened in prison, you—let me back up. You said something happened in prison as far as there was a sexual—

MR. SIDDIQ: Your Honor, I'm sorry, based on the Court's own ruling, I think at the point that she answers no, I think we're done with this hearing.

THE COURT: I want to just clarify that she understands what I'm saying. I would agree with what you're saying.

So you're saying that what happened in the prison, you said something happened, that that really did happen? There was a sexual assault that did happen in the prison?

MS. SAWYER: No.

THE COURT: It did not happen.

MS. SAWYER: No.

THE COURT: Okay. So you said it happened, but it really didn't.

MS. SAWYER: There was more to the story, but—

THE COURT: Let me ask you this: Was there any sexual activity that occurred at all?

MS. SAWYER: Yes.

THE COURT: So there was, in fact, sexual activity that occurred between you and this other person.

MS. SAWYER: Yes.

Tr. at 442–443; 444–445; 448–449.

{¶ 71} We note, Appellant introduced the evidence under seal. Based upon the Ohio Supreme Court's holding in *Boggs*, we find the trial court did not error in excluding the evidence. During voir dire, Sawyer testified she had not falsified any accusations; rather, "there was more to the story." Sawyer further testified sexual

conduct did occur. Pursuant to the case law cited, the evidence is barred by the rape shield statute.

{¶ 72} The third assignment of error is overruled.

*State v. Garn*, 2017-Ohio-2969, ¶¶ 64-72.

Ohio Evid. R. 608(B) states that "specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid. R. 609, may not be proven by extrinsic evidence." Here, Garn soughtto introduce Sawyer's prison discipline records regarding her prior assertion of sexual assault. Yet, as stated above, Ohio Evid. R. 608(B) prohibits Garn from eliciting extrinsic evidence from Sawyer through her prison discipline records.

Next, Garn wanted to cross-examine Sawyer regarding her prior allegation of sexual assault for the purpose of impeaching Sawyer's credibility. As the Ohio Court of Appeals pointed out, under *State v. Boggs*, 63 Ohio St. 3d 418 (1992), examination into prior conduct is sometimes permitted under Ohio Evid. R. 608(B), but such inquiry is expressly barred where the prior conduct involved sexual activity. If such an issue arises, *Boggs* instructs that a trial court should conduct a voir dire hearing of a witness regarding purported false allegations of sexual activity. If the trial court determines that the allegation is wholly false - meaning no sexual activity occurred - then Ohio's rape shield law does not apply, and the inquiry is permitted. However, if the court determines that any sexual activity occurred, the rape shield law applies and inquiry is barred.

Pursuant to R.C. § 2907.02(E), before the court "tak[es] testimony or receiv[es] evidence of any sexual activity of the victim or of the defendant in a proceeding under this section, the court shall resolve the admissibility of the proposed evidence in a hearing in chambers, which shall be held at or before preliminary hearing and not less than three days before trial, or for good cause shown during the trial." Here, as required, the trial court – in reliance on *Boggs* - held an *in camera*

21

hearing. There, the trial court determined that this inquiry could not proceed further because Krystal Sawyer testified that she was disciplined for getting caught rather than making a false allegation. (ECF Doc. 9-6, PageID#1445). Because this testimony would have been barred under *Boggs*, there was no impeachment value, making the probative value of cross-examining Sawyer minimal at best.

To the extent that Garn argues in his traverse that Ohio's rape shield law is inapplicable because he was charged with sexual battery, this Report and Recommendation need not address this newly raised argument. (*See* ECF Doc. 14, PageID#2915-16). Garn acknowledges in his traverse that he had not raised the inapplicability of rape shield laws to the adjudication of sexual battery. Yet he nevertheless maintains in his traverse that he previously argued in his merits brief that the "state court's decision to preclude evidence of Sawyer's prior false accusations of sexual assault violated firmly established precedent of the Supreme Court of the United States denying his federal constitutional rights as protected by the Sixth Amendment." (*Id.* at 2916).

Garn is attempting to entirely recast in his traverse the nature of the argument he previously asserted in his merits brief. Specifically, Garn argued in his merits brief that the application of Ohio's rape shield statute was in violation of his Sixth Amendment rights under the U.S. Constitution (ECF Doc. 1-2, PageID#48) because the Fifth District Court of Appeals never considered the balancing test required by *Gardner*.  Garn did *not,* however, argue that that the rape shield law was applicable to the adjudication of sexual battery (*see id.* at 50-51), nor did he raise this argument in his direct appeal. (ECF Doc. 7-1, PageID#257-60). "New issues may not be raised in the traverse." *McClendon v. Wainwright*, No. 1:17 CV 0589, 2018 WL 7982929, at *3 (N.D. Ohio Nov. 13, 2018), *report and recommendation adopted*, No. 1:17 CV 589, 2019 WL 1558739 (N.D. Ohio Apr. 10, 2019) (citing *Burns v. Lafler*, 328 F. Supp. 2d 711, 724 (E.D. Mich. 2004)

(citation omitted) ("[A] court cannot consider new issues raised in a traverse or reply to the State's answer.")). Thus, this Report and Recommendation need  not address this entirely new argument asserted for the first time in Garn's traverse.

Based on the facts presented and analysis of the record before me, I cannot find that the state court's adjudication of the Confrontation Claus issue was contrary to or involved an unreasonable application of clearly established federal law as set forth by the Supreme Court. Therefore, the denial of the cross-examination of Sawyer regarding her purported prior false sexual assault allegation does not violate the Confrontation Clause. Accordingly, I recommend that the Court deny Garn's Confrontation Clause claim.

### B.  Ground Two: Constitutionality of Ohio's LEADS Statute

Garn next contends that Ohio's LEADS statute is (1) unconstitutionally vague and  (2) violates the separation of powers. For the reasons set forth below, both claims fail.

#### 1. *Vagueness*

Garn claims that the statutory language defining a LEADS violation (OAC 4501:2-10-03(C)(3)) is vague as to "express or implied consent" to use the LEADS system. He contends that "the standard is so fluid it provides no guidance to the user because it can change at any time: a police officer can run afoul of the regulations, and be charged with a felony, simply because he missed the latest "newsletter" or "administrative message."" (ECF Doc. 1-2, PageID#46). Garn argues this result is corroborated by the testimony of police officers that contradicted each other and themselves regarding whether a LEADS search could be run only after a traffic stop, whether there was implied consent for usage, and "other confessions of confusion." (*Id.*).

The Ohio Court of Appeals adjudicated this claim on the merits. Thus, this Court's inquiry, under AEDPA's deferential standard of review, is limited to whether the state appellate court's decision amount to an unreasonable application of clearly established federal law.

In determining Garn's vagueness challenge, the Ohio Court of Appeals held the following:

[*P9]  In the first assigned error, Appellant maintains his convictions for LEADS violations are unconstitutional as the statute is void for vagueness. Specifically, Appellant asserts the statute fails to provide notice of proscribed behavior, and the statute impermissibly allows the executive branch to determine what constitutes a violation of law.

[*P10]  R.C. 2913.04 (C) and (D) read,

(C) No person shall knowingly gain access to, attempt to gain access to, cause access to be granted to, or disseminate information gained from access to the law enforcement automated database system created pursuant to section 5503.10 of the Revised Code without the consent of, or beyond the scope of the express or implied consent of, the chair of the law enforcement automated data system steering committee.

(D) No person shall knowingly gain access to, attempt to gain access to, cause access to be granted to, or disseminate information gained from access to the Ohio law enforcement gateway established and operated pursuant to division (C)(1) of section 109.57 of the Revised Code without the consent of, or beyond the scope of the express or implied consent of, the superintendent of the bureau of criminal identification and investigation.

[*P11]  The trial court's March 31, 2016 Judgment Entry overruling Appellant's motion to dismiss states,

Notice in cases charged under this statute comes, not from the statute, but from work place manuals, policies and, to some extent, common sense. An employee should be on notice that committing crimes or engaging in conduct that has a negative impact on the company while using a work computer would be against the implied consent granted by his or her workplace.

***

This Administrative Code section in and of itself specifies the extent of consent officers have for use of LEADS. [Citing OAC Ann. 4501:2-10-06(C)]

24

***

It is clear from this Administrative Code section that LEADS is to be used for the administration of criminal justice and not for personal use. Further, as pointed out by the Defendant, there are policies and guidelines that agencies participating in LEADS must adhere to that are published in the NCIC operating manual, DJIS security policy, LEADS operating manual, LEADS security policy, newsletters, and administrative messages from LEADS. [Citing OAC Ann. 4501:2-10-03(C)(3).] Whether these policies are subject to change does not alter the basic fact that these databases are for law enforcement purpose only and personal use for any reason goes beyond the express consent of the chair of the law enforcement automated data system steering committee and/or the superintendent of the bureau of criminal identification and investigation.

[*P12]  Appellant was convicted of twelve counts of unauthorized use of the LEADS database, in violation of R.C. 2913.04(C) and (D). In support of his argument the statute is unconstitutionally vague, Appellant cites the testimony of various law enforcement officers at trial as to arbitrary compliance and standards of practice. We note Appellant did not renew the motion to dismiss the charges following the trial court's denial of his motion to dismiss on March 31, 2016. As the trial court overruled Appellant's motion prior to trial, the subsequent trial testimony offered in support of Appellant's argument cannot be considered.

[*P13]  Legislative enactments are afforded a strong presumption of constitutionality. *State v. Collier* (1991), 62 Ohio St.3d 267, 269, 581 N.E.2d 552. When possible, statutes are to be construed in favor of conformity with the Ohio and United States Constitutions. *Id.* A party asserting a statute is unconstitutional must prove the statute is unconstitutional beyond a reasonable doubt. *Id.*

[*P14]  The critical question in all cases as to void for vagueness is whether the law affords a reasonable individual of ordinary intelligence fair notice and sufficient definition and guidance to enable him to conform his conduct to the law. *City of Norwood v. Horney*, 110 Ohio St.3d 353, 380, 2006 Ohio 3799, 853 N.E.2d 1115 (2006).

[*P15]  Statutes which do not fairly inform a person of what is prohibited will be found unconstitutional as violative of due process. *State v. Carrick*, 131 Ohio St.3d 340, 2012-Ohio-608, 965 N.E.2d 264, ¶ 14, citing *State v. Reeder*, 18 Ohio St.3d 25, 26, 18 Ohio B. 21, 479 N.E.2d 280 (1985) and *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *Columbus v. Thompson*, 25 Ohio St.2d 26, 266 N.E.2d 571 (1971). However, "'[i]mpossible standards of specificity are not required. * * * The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by

common understanding and practices.'" *Id.* at ¶ 14, quoting *Jordan v. De George*, 341 U.S. 223, 231-232, 71 S.Ct. 703, 95 L.Ed. 886 (1951).

 [*P16]  A facial challenge requires "the challenging party * * * show that the statute is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.'" *Carrick*, supra, 131 Ohio St.3d 340, 2012-Ohio-608, 965 N.E.2d 264, at ¶ 15, citing *State v. Anderson*, 57 Ohio St.3d 168, 171, 566 N.E.2d 1224 (1991), quoting *Coates v. Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). Stated another way, "the challenger must show that upon examining the statute, an individual of ordinary intelligence would not understand what he is required to do under the law." *Id.* Appellant "must prove, beyond a reasonable doubt that the statute was so unclear that he could not reasonably understand that it prohibited the acts in which he engaged." *Id.*, citing *United States v. Harriss*, 347 U.S. 612, 617, 74 S. Ct. 808, 98 L. Ed. 989 (1954); 25 Ohio Jurisprudence 3d, Criminal Law, Section 8, at 106 (1981). See, *In re L.Z.*, Licking App., 2016-Ohio-1337, 61 N.E.3d 776.

 [*P17] We find the statute is not void for vagueness. Appellant, a law enforcement officer, could and should have understood his duties and responsibilities with regard to utilizing the LEADS system for legitimate law enforcement purposes. Appellant knew or should have known the acts which would be against the expressed or implied consent of the law enforcement automated data system steering committee and/or the superintendent of the bureau of criminal identification and investigation. The evidence demonstrates Appellant was LEADS certified, and successfully completed retesting, scoring high averages. The Ohio Administrative Code sections cited by the trial court herein provide adequate notice of what Appellant is required to do or prohibited to do under the statute.

*State v. Johnson*, 1992 Ohio App. LEXIS 699, 8th Dist. Cuyahoga No. 59190, the Eighth District held a previous version of R.C. 2913.04 was constitutional and not void for vagueness. The statute was less specific than the version at issue herein.

 [*P19] We further find the statute does not violate the separation of powers doctrine. The statute prohibits a person from knowingly gaining access to the LEADS system without the consent of or beyond the scope of express or implied consent of the chair of the LEADS steering committee or the superintendent of the bureau of criminal identification and investigation. We disagree with Appellant's argument the statute allows the executive branch to define the elements of the crime.

 [*P20]  The legislature clearly prohibited a person from knowingly gaining access to the LEADS system either beyond the scope of consent of the chair of the LEADS steering committee or the superintendent of the bureau of criminal identification and investigation. As both the chair and superintendent govern the

use of the LEADS system, the statute does not allow them to define the elements of the crime; rather, to oversee the use of and administration of the LEADS system. Whether the policies are subject to change does not alter the fact the databases were for law enforcement purposes only, and personal use for any reason is beyond the consent either expressed or implied.

[*P21]  The first assignment of error is overruled.

*State v. Garn*, 2017-Ohio-2969, ¶¶ 9-21, 91 N.E.3d 109, 113-16 (Ct. App.).

The void-for-vagueness doctrine requires that a "penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *see also United States v. Williams*, 553 U.S. 285 (2008); *Parker v. Levy*, 417 U.S. 733, 757 (1974) ("Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.") (internal quotation marks and citations omitted). Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, the Supreme Court has recognized that the more important aspect of the vagueness doctrine "is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement." *Smith v. Goguen*, 415 U.S. 566, 574 (1974).

The court reasonably found that Ohio's LEADS statute was not unconstitutionally vague and met due process notice requirements. Both R.C. § 2913.04(C) and (D) explicitly prohibit a person from knowingly gaining access to the LEADS system either beyond the scope of the LEADS steering committee chair or the superintendent of the bureau of criminal identification and investigation. *See* R.C. § 2913.04 (C), (D). Garn focuses his vagueness argument on the meaning of "express or implied consent" under the LEADS statute. Yet, although the language of a criminal statute must convey sufficiently definite warning as to the proscribed conduct, when measured by

common understanding and practices, "impossible standards of specificity are not required." *North American Van Lines, Inc. v. United States*, 243 F.2d 693, 697 (6th Cir. 1957). While a vagueness analysis in the context of First Amendment rights may involve consideration of hypothetical facts not specifically before the court, "***it is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand***." *United States v. Powell*, 423 U.S. 87, 92 (1975) (citations omitted) (emphasis added). Thus, a defendant bears the burden of establishing that the statute is vague as applied to his particular case, not merely that the statute could be construed as vague in some hypothetical situation. *United States v. Avant*, 907 F.2d 623, 625 (6th Cir. 1990).

While Garn points to testimony that he maintains may indicate that regulations change and a police officer could run afoul of the regulations, these hypothetical facts are not at issue for this vagueness determination. Rather, Garn had the burden of demonstrating that the statute was vague as applied to his particular case. He failed to do so.

R.C. § 5503.10 created in the department of public safety, division of state highway patrol "a program for administering and operating a law enforcement automated database system, to be known as LEADS, providing computerized data and communications to the various criminal justice agencies of the state." Under this statute, the superintendent of the state highway patrol is the administrator. The superintendent shall appoint a steering committee to advise in the operation of the system, and shall adopt rules and guidelines for the operation and participation in the LEADS program. The "rules adopted by the committee shall include criteria for granting and restricting access to information maintained in LEADS." OAC 4501:2-10-06(A) limits LEADS use to "certified operators" who are "accountable for all transactions occurring while their assigned account is logged on to a terminal accessing LEADS."

28

Under OAC Ann. 4501:2-10-06(C), the code defines the scope of authorized access for a law enforcement officer such as Garn. Specifically, LEADS access is restricted to "the use of duly authorized law enforcement and/or criminal justice agencies for the administration of criminal justice."[10] It notes that the access to and dissemination of LEADS throughput is governed by the LEADS security policy, LEADS manual, and NCIC operating manual. Further, R.C. § 2913.04(H) establishes that violation of R.C. § 2913.04(C), the unauthorized access, use, or dissemination of information gained from LEADS, is a fifth-degree felony.

Here, based on the Ohio statute and administrative code, there was sufficient notice to LEADS users like Garn that the system should only be used for official law enforcement purposes. Moreover, as determined by the state appellate court, Garn was a law enforcement officer and could have understood his duties and responsibilities with regard to utilizing the LEADS system for legitimate law enforcement purposes. Indeed, Garn did complete LEADS certification and retesting. Specifically, Garn passed two LEADS recertification tests with scores of 94% and 100%. (ECF Doc. 9-7, PageID#1885-86). Significantly, the state appellate court found that Garn himself even "testified *he understood LEADS could not be used for an unlawful purpose or for personal gain.*" *State v. Garn*, 2017-Ohio-2969, ¶3 (emphasis added).

There is therefore ample evidence for the state appellate court's reasonable conclusion that Garn knew or should have known acts that would be against the express or implied consent of the

---

[10] Under OAC 4501:2-10-01(A), the "administration of criminal justice" is defined as the following:

> "Administration of criminal justice" means the detection, apprehension, detention, pretrial release, post-trial release, prosecution, adjudication, correctional supervision, or rehabilitation of accused persons or criminal offenders. It also includes criminal identification activities; the collection, storage, and dissemination of criminal history record information; and criminal justice employment. In addition, administration of criminal justice includes "crime prevention programs" to the extent access to criminal history record information is limited to law enforcement agencies for law enforcement programs (e.g. record checks of individuals who participate in "Neighborhood Watch" or "safe house" programs) and the result of such checks will not be disseminated outside the law enforcement agency.

LEADS steering committee and/or the superintendent of the bureau of criminal identification and investigation. To the extent that Garn attempts to rely on certain officers' testimony to demonstrate ambiguity, there is testimony from other officers that there was no ambiguity about the proper usage of LEADS; it could only be used for law enforcement purposes. (ECF Doc. 9-5, PageID#1320-21; ECF Doc. 9-6, PageID#1423-24, 1492-93, 1550; ECF Doc. 9-7, PageID#1754, 1786-90).

Garn asserts in his traverse that Supreme Court precedent requires that a penal code define the criminal offense with sufficient definiteness. He argues that Respondent and the appellate court relied on non-penal codes such as the Ohio Administrative Code and the LEADS training manual, and further contends that some of the Ohio Administrative Code that Respondent relied on merely set forth definition. Yet, while Garn takes issue with the state appellate court's and Respondent's reliance on administrative code in analyzing the statute, Garn wholly fails to cite any case law to support his conclusory assertion that this is improper. Based on the state appellate court's analysis and discussion, as well as the entirety of the record, I cannot conclude that the state appellate court's determination was a violation of clearly established federal law or an unreasonable determination of the facts. Accordingly, I recommend that the Court deny Garn's vagueness sub-claim.

### 2. *Separation of Powers*

Garn's second assertion within his Ground Two claim is that the LEADS statute violates the separation of powers doctrine. He contends that the state legislature violated firmly established precedent established by the Supreme Court of the United States. Citing *State ex rel. Bray v. Russell*, 89 Ohio St.3d 132, 134 (2000), Garn asserts that the Ohio Supreme Court determined that the separation of powers doctrine is implicitly embedded in the entire framework of the Ohio

30

Constitution. Further, he asserts that it is the legislature's role to define the elements of the crime. In this case, Garn contends that the legislature defined only two elements: (1) *mens* rea; and (2) the actual accessing of the LEADS database. He contends that what constitutes a violation of the statute was determined by a "committee" of executive and judicial figures, rather than the state legislature. Relying on *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), Garn contends that the U.S. Supreme Court found that the New Hampshire state legislature violated the constitutional rights of individuals and due process of law when the legislature delegated legislative inquiry to the Attorney General and executive branch. He asserts that his case is worse *Sweezy* because the "LEADS statute has delegated legislative *law-making* authority to agencies established by the executive branch and comprise of executive and judicial figures." (emphasis in original).

Here, the Ohio Court of Appeals rejected Garn's assertion for the following reasons:

 [*P19] We further find the statute does not violate the separation of powers doctrine. The statute prohibits a person from knowingly gaining access to the LEADS system without the consent of or beyond the scope of express or implied consent of the chair of the LEADS steering committee or the superintendent of the bureau of criminal identification and investigation. We disagree with Appellant's argument the statute allows the executive branch to define the elements of the crime.

 [*P20]  The legislature clearly prohibited a person from knowingly gaining access to the LEADS system either beyond the scope of consent of the chair of the LEADS steering committee or the superintendent of the bureau of criminal identification and investigation. As both the chair and superintendent govern the use of the LEADS system, the statute does not allow them to define the elements of the crime; rather, to oversee the use of and administration of the LEADS system. Whether the policies are subject to change does not alter the fact the databases were for law enforcement purposes only, and personal use for any reason is beyond the consent either expressed or implied.

*State v. Garn*, 2017-Ohio-2969, ¶¶ 19-20.

Garn has not established – much less explained - how the Ohio Court of Appeals reached an unreasonable conclusion based on clearly established federal law. Indeed, it appears doubtful

that this claim is even cognizable because Garn appears to be alleging a separation of powers claim by citing to Article 4, Section 4 of the United States Constitution, and then citing *State ex rel. Bray v. Russell* for the proposition that the separation of powers is applicable to the Ohio constitution. In *Sweezy v. New Hampshire*, the Supreme Court held that "the concept of separation of powers embodied in the United States Constitution is ***not mandatory in state governments***." 354 U.S. 234, 254 (1954) (emphasis added); *see also Dreyer v. Illinois*, 187 U.S. 71, 84 (1902) ("Whether the legislative, executive and judicial powers of a State shall be kept altogether distinct and separate, or whether persons or collections of person belonging to one department may, in respect to some matters, exert powers which, strictly speaking, pertain to another department of government, is for the determination of the State."); *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (holding that a claim under doctrine of separation of powers presents an issue of state law that was not subject to federal habeas review).

Assuming Garn is not raising a federal separation of powers issue, Garn has not established how the Ohio appellate court reached a conclusion based on an unreasonable application of clearly established federal law. Here, as the Ohio appellate court recognized, the statute prohibits a person from knowingly gaining access the LEADS system "without the consent of or beyond the scope of express or implied consent of the chair of the LEADS steering committee or the superintendent of the bureau of criminal." *See* R.C. 2913.04(C) and (D). Because the chair and superintendent govern the use of the LEADS system, the statute does not permit them to define the elements of the crime. Rather, they oversee the use of and administration of the LEADS system. Garn merely rehashes – nearly verbatim - the same argument rejected by the state appellate court on direct appeal and conclusorily asserts that the statute grants an executive "committee" the ability to define

32

the elements of the crime. But he fails to demonstrate how that is the case here.[11]  Accordingly, this argument fails.

Further, Garn's reliance on *Sweezy* is unavailing because it is readily factually distinguishable from the instant case. In *Sweezy*, the issue before the U.S. Supreme Court was the propriety of whether the New Hampshire legislature could direct the state attorney general to investigate subversive activities of the state. The Court's conclusion that the legislature's action was improper rested upon "a separation of the power of a State legislature to conduct investigations from the responsibility to direct the use of that causes a deprivation of individuals and a denial of due process of law." *Sweezy,* 354 U.S. at 255. Here, Garn's reliance on *Sweezy* fails because the Supreme Court did not establish a rule that applies to the facts in this case. Garn provides no case authority or analysis to support his assertion that the Ohio court's alleged delegation is "worse as the Ohio legislation, through the LEADS statute has delegated legislative *law-making* authority to agencies established by the executive branch and comprise of executive and judicial figures." (ECF Doc. 1-2, PageID#47-48) (emphasis in original).

Because Garn has failed to point to any clearly established law demonstrating that the Ohio LEADS statute or a statute of a similar nature is violative of the separation of powers, Garn has not demonstrated the appellate court's decision was an unreasonable application of clearly established federal law. *Miskel v. Karnes*, 397 F.3d 446, 454 (6th Cir. 2005) ("Under AEDPA, if there is *no* clearly established Federal law, as determined by the Supreme Court that supports a

---

[11] Garn merely asserts that the state legislature delegated, "at least partly," the determination of what constitutes a violation of Ohio Law to NCIC, a federal law executive committee. (ECF Doc. 1-2, PageID#47). Then, he argues that: "It as though the legislature defined felonious assault as knowingly causing serious physical harm, and then left it up to a committee to determine the meaning of the latter phrase, with definitions depending on the vagaries of a process which expounded those definitions through newsletters and ever-changing manuals." (*Id.*).

habeas petitioner's legal argument, the argument must fail.") (emphasis in original). Accordingly, I recommend that the Court deny this claim.

### C. Ground Three: *Brady*/*Napue* Claims – Withholding of Favorable Materials

Garn launches multiple sub-claims challenging the state appellate court's determination that the State's alleged withholding of specific materials did not constitute *Brady*/*Napue* violations. At times, it is unclear what specific exhibit determination Garn is challenging because he does not explain in either his merits brief or his traverse how his arguments correlate to any specific exhibits. (*See generally* ECF Doc. 1-2, PageID#51-69; ECF Doc. 14, PageID#2948-67). The difficulty in analyzing Garn's *Brady*/*Napue* claims is further compounded by the fact that Garn, represented by counsel, wholly failed to provide citations to the record for several portions of the testimony throughout his 56-page merits brief. (*See generally* ECF Doc. 1-2, PageID#18-73). This is a clear violation of Magistrate Judge Ruiz's Initial Order in this case, which stated in relevant part that briefs "shall make ***specific reference to those portions of the record (Page and Exhibit Number) in support***." (ECF Doc. 3, PageID#77) (emphasis added).[12] Furthermore, many of the *Brady*/*Napue* arguments raised in his merits brief appear to be a nearly verbatim rehashing of the arguments Garn asserted in his post-hearing brief to the Richland County Court of Common Pleas (*See* ECF Doc. 7-1, PageID#524-45; ECF Doc. 1-2, PageID#52-68) – arguments that were rejected by the trial court and the Ohio appellate court.

Setting aside these issues, Garn appears to raise the following arguments: (1) the non-disclosure of Margaret Konczak's ("Konczak" or "Ms. Konczak") alleged fabrication constituted

---

[12] "[J]udges are not like pigs, hunting for truffles that might be buried in the record." *Dibrell v. City of Knoxville, Tenn.*, 984 F.3d 1156, 1163 (6th Cir. 2021). This Report and Recommendation notes Garn's traverse (ECF Doc. 14) converts the legal complaint-like nature of his merits brief arguments to paragraph form, includes the missing citations, and then adds additional arguments. This Report and Recommendation will therefore rely on the citations Garn provides in his traverse to guide its analysis.

a *Brady* violation; (2) the non-disclosure of an FBI draft letter (Exhibit 7) authored by Prosecutor Couch-Page constituted a *Napue* violation; (3) the non-disclosure of a January 15, 2015 report by Lieutenant Petrycki, which stated that Detective Deitrich contacted him after meeting with Ms. Sawyer, was a *Brady* violation because the State was required to turn over all witness statements; (4) the testimony of First Assistant Prosecutor Cliff Murphy shows the Richland County Prosecutor's Office awareness of multiple interviews with victims that were not provided to the defense; (5) the testimony of Assistant Prosecuting Attorney Omar Siddiq indicated that there was evidence of additional interviews, wherein victims lied or were hesitant to inculpate Garn, and the State did not provide it to the defense; (6) the cross-examination of Ms. Sawyer on her recantation does not cure the State's alleged intentional withholding of material evidence; (7) the testimony of Kelly Harding ("Harding" or "Ms. Harding") that she tried to recant, but the State threatened her with legal charges, undermines confidence in Garn's convictions as they relate to her; (8) the non-disclosure of two 2012 STEP logs violated *Brady v. Maryland*, *Kyles v. Whitley*, and *Napue v. Illinois*; and (9) the non-disclosure of the Rich Miller Report indicating a prior false sexual accusation by Ashley Matthews ("Matthews" or "Ms. Matthews") was a *Brady* violation. (*See* ECF Doc. 1-2, PageID#52-69).

### 1. Legal Standards

The Sixth Circuit has summarized the law governing *Brady* claims as follows:

> Under *Brady v. Maryland*, the government has a constitutional obligation to furnish a criminal defendant with any exculpatory evidence related to the defendant's guilt or possible punishment. 373 U.S. at 87. "[S]uppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* Thus, in order to comply with Brady, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286(1999) (quoting *Kyles v.*

*Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)) (internal quotation marks omitted).

The prosecutor's duty to disclose under *Brady* encompasses impeachment evidence as well as exculpatory evidence. *Id.* at 280 (citing *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)); *Hawkins v. Coyle*, 547 F.3d 540, 556 (6th Cir.2008). "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

"A successful *Brady* claim requires a three-part showing: (1) that the evidence in question be favorable; (2) that the state suppressed the relevant evidence, either purposefully or inadvertently; (3) and that the state's actions resulted in prejudice." Bell v. Bell, 512 F.3d 223, 231 (6th Cir.2008) ....

Evidence is deemed material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *accord* Johnson v. Bell, 525 F.3d 466, 475 (6th Cir.2008) (*citing* Strickler, 527 U.S. at 289–90.) As the Supreme Court has further explained:

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles*, 514 U.S. at 434. Therefore, "favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Cone v. Bell*, —— U.S. ——, 129 S.Ct. 1769, 1783, 173 L.Ed.2d 701 (2009) (quoting *Kyles*, 514 U.S. at 435).

*Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir.2010).

Moreover, it has long been recognized that "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one," *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); as such, "the Constitution does not require the prosecutor to share all useful information with the defendant." *United States v. Ruiz*, 536 U.S. 622,629 (2002)

(citing *Weatherford*, 429 U.S. at 559). Also, the state must actually suppress evidence in its possession for a *Brady* violation to occur. *Elmore v. Foltz*, 768 F.2d 773, 777 (6th Cir.1985). The Sixth Circuit has observed, that "'*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to complete failure to disclose,' and that delay violates *Brady* only "'when the delay itself causes prejudice.'" *O'Hara v. Brigano*, 499 F.3d 492, 502 (6th Cir.2007) (quoting *United States v. Bencs*, 28 F.3d 555,560 (6th Cir.1994), and *United States v. Patrick*, 965 F.2d 1390,1400 (6th Cir.1992), *judgment vacated and remanded on other grounds by Mohwish v. United States*, 507 U.S. 956, 113 S.Ct. 1378, 122 L.Ed.2d 754 (1993)).

### 2. Exhibit 1 – Margaret Konczak Fabrication

Garn asserts that the State took the position at his post-conviction hearing that Ms. Konczak was not a victim. He asserts that this position was significant for two reasons: (1) the State argued throughout the trial that Garn's motivation for allegedly destroying evidence was sexual motivation; and (2) Ms. Konczak was permitted to provide a victim impact statement at sentencing. (ECF Doc. 1-2, PageID#52). Notably, Garn asserts, Ms. Konczak was the only alleged victim to make a statement at sentencing. (*Id.*). He asserts that *Brady* applies equally to sentencing material. (*Id.*). He contends that if his trial counsel had been provided Lieutenant Petrycki's report indicating two female inmates of Ms. Konczak's - Ashley Schriner ("Schriner" or "Ms. Schriner") and Loretta Chinn ("Chinn" or "Ms. Chinn") - overheard and were told respectively that Ms. Konczak admitted that she fabricated her allegations, his trial counsel would have called both inmates as witnesses. (*Id.*). Garn further asserts that the witnesses would have testified that Ms. Konczak had a reputation for untruthfulness. (*See id.* at 52-53). Further, he contends that Lieutenants Petrycki and Storz testified at the post-conviction hearing that this information was important to Garn's

investigation. (*Id.* at 53). He states that this testimony, along with Ms. Schriner and Ms. Chinn's testimony, would be indicative of Garn's innocence. (*Id.*).

Garn further asserts that Lieutenant Petrycki drafted a report, and the police department was allegedly unable to explain what happened to it. (*Id.*). Despite Lieutenant Petrycki placing the report in a basket for Captain Snavely, Garn asserts that Lieutenant Petrycki testified that he "never followed up on the information," despite this information being "very important." (*Id.*). Garn also states that Captain Snavely did not remember receiving it. (*Id.*). He contends that the existence of this report "documented material information and that it was never provided to trial counsel." (*Id.*). He contends that this report was material to both his guilt and punishment, necessitating his convictions be vacated. (*Id.*). He further asserts that the witness testimony was material because the appellate court relied on Ms. Konczak's testimony in upholding Garn's tampering with evidence conviction, (*id.* at 55) and cited her testimony as material to their decision as to sufficiency of the evidence. (*Id.*). Because the appellate court relied up on her testimony to meet the elements of his case, Garn contends that "clearly" it would have been relied upon by the jury. (*Id.*).

Finally, Garn asserts that this materiality also applies to sentencing. (*Id.* at 56). He asserts that the failure to turn over evidence that Ms. Konczak allegedly falsified her allegations impacted both his conviction and sentence. (*Id.*). Although tampering with evidence is a "victim-less crime under the Ohio Revised Code," Garn contends that the trial court permitted Ms. Konczak to give a sentencing statement. (*Id.*). He further claims that the victim-impact statement weighed heavily on the Court's sentencing determination based on the following statement from the trial court at sentencing:

> There was nothing done with the evidence because the deal was the evidence would never be submitted the lab for your own personal gain, whether that be sexual or

38

dating or whatever. Your relationship as the arresting officer is what facilitated these offenses to the victim. These are all factors the Court considered in making the conduct more serious. And I believe that there was a sexual motivation for many of these offenses.[13]

(*Id.*)

First, to the extent that Garn attempts to rely on Ms. Konczak's victim impact statement and the State's argument regarding Garn's sexual motivation for allegedly destroying evidence, these arguments are barred by *res judicata*. As the state appellate court determined, Garn did not raise this argument during his direct appeal. *State v. Garn*, 2019-Ohio-1604, ¶¶128-30. Ohio courts regularly apply the doctrine of *res judicata* to foreclose review of claims that could have been or were raised in an earlier proceeding. And the Sixth Circuit has long held the application of *res judicata* to be an adequate and independent state ground to foreclose habeas relief in federal court. *See, e.g.*, *Landrum v. Mitchell*, 625 F.3d 905, 934 (6th Cir. 2010) ("The Ohio Court of Appeals' reliance on res judicata was an adequate and independent state ground to foreclose habeas relief in federal court."). Here, Garn wholly fails to address the *res judicata* bar to this argument in his merits brief or Traverse.

Turning to the arguments not barred by *res judicata*, the state appellate court reasonably concluded that there was no *Brady* violation regarding Lieutenant Petrycki's report. The Ohio Court of Appeals stated the following:

### a)). Garn's arguments concerning Exhibit One.

[*P19]  Garn contends that "[n]ot only could the information have been used to impeach Konczak, but it could have been used in cross-examination of Sawyer." *Merit Brief For Appellant*, filed Nov. 20, 2018 at 26. Garn submits that the testimony of Schriner and Chinn "would cast serious doubt as to both Konczak's credibility as well as Sawyer's." *Merit Brief For Appellant*, filed Nov. 20, 2018 at

---

[13] Garn does not provide a direct citation to the record for the trial court's statement in his merits brief. (*See* ECF Doc. 1-2, PageID#53). Although he provides a citation to "Trial Transcript 1436-37" in his traverse (ECF Doc. 14, PageID#2954), upon the Court's review, this does not appear to a record that was made available to this Court by either the State or Garn on EM/ECF. (*See generally* ECF Doc. 9).

27(Footnote omitted). Garn submits that the evidence submitted meets the "materiality test" for disclosure set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct, 1194, 10 L.Ed.2d 215(1963). *Merit Brief For Appellant*, filed Nov. 20, 2018 at 27.

***b)). Competent, credible evidence supports the trial court's decision that non-disclosure of Exhibit One did not violate Garn's due process rights to a fair trial; the impeachment evidence cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.***

### *1]. Margaret Konczak.*

 [*P20]  In the case at bar, with respect to Margaret Konczak, Garn was convicted of Count 31 of the Indictment, Dereliction of Duty and Count 37 of the Indictment, Tampering with Evidence. The Bill of Particulars filed under seal on September 4, 2015 alleged in Count 31 that Garner had been "handed drugs from a Corrections Officer recovered from Margaret Konczak. The defendant failed to log these drugs into evidence." In Count 37 & 38, "Specifically with regard to Margaret Konczak and [A.M.] in disposing of drugs."

 [*P21]  On June 11, 2014, Margaret Konczak and Brandy Vance attempted to steal a grill from a Kroger store in order to purchase heroin. Garn arrested Konczak and Vance and took them to the jail. (4T. at 114). While awaiting processing, Garn and Konczak engaged in conversation wherein Konczak admitted to an addiction with heroin. Garn began flirting with her. (4T. at 114).

 [*P22]  At the jail, Correction Officer Hout processed Konczak and inventoried her possessions. During the inventory search of Konczak's purse a prescription pill bottle was found. (4T. at 160). Upon opening the bottle, Hout found "a folded yellow piece of post-it pad paper." (4T. at 160). Inside the paper was "[a] small hard rock of, like, a yellowish color." (4T. at 160). In accordance with established protocol, Hout showed it to Sargent Young. (4T. at 161). Hout then called dispatch to have them send Garn back to the jail. (4T. at 161). When Garn returned Hout handed the substance to Garn. Garn asked to speak to Konczak so Hout opened the cell door. (4T. at 163). Konczak testified Garn approached her and quietly told her if she contacted him upon her release, he would make the heroin go away. Konczak testified at trial,

> Officer Garn came into my jail cell and he says, Whose is this? And he said it was in the flowered bag, which it was mine. I said the flowered bag was mine but I didn't know that I had it in there. He basically looked at me and said, If you get ahold of me when you get out of here, this goes away.

4T. at 116.

[*P23]  Garn told Hout he would take the substance back to have it tested. (4T. at 167; 8T. at 1117). However, when Hout spoke to Garn on a later date, Garn told Hout he did not take it to the crime lab because Garn was sure it was baking soda. (4T. at 164).

[*P24]  Garn testified at trial he may have used "psychological factors" that could be misinterpreted as flirting in order to get a suspect to become an informant. (8T. at 1110; 1169-171). Garn admitted being called back to the jail. (8T. at 1174). Garn admitted talking to Konczak at the door of her cell. (8T. at 1174). Garn admitted that he took the substance and did not turn it into the crime lab. (8T. at 1175). Garn testified that he field tested the substance and the field test came back negative. He then discarded the substance, believing it to be a cutting agent used for heroin. He testified he never heard of a false-negative field test; therefore, did not want to waste time and space. (8T. at 1117). He also testified he never heard from Konczak again. (Id.).

[*P25] Officer Mike Napier of the Mansfield Police Department testified in March, 2014, the officers of the department were told to discontinue field testing. (7T. at 783). He further testified any evidence acquired at the jail could not be thrown away, and had to be sent to the crime lab. (Id.).

[*P26]  Anthony Tabasco, Director of the Mansfield Police Department forensic science laboratory testified, in March, 2014, he emailed the officers of the department, advising the officers to avoid handling heroin as the substance could contain fentanyl. He stated the officers should discontinue field testing of drugs. (4T. at 18). On cross-examination, the following exchange took place,

> [Defense Counsel]: If it tested negative and so it seemed pretty clear to them that it was NutraSweet, or aspartame, or something like that and then they tested it and it came out negative, are you saying that even in that situation there's no discretion on the officer? That everything had to be turned in to your lab?
> Tombasco: Yes, they have to turn it all in to the lab.

4T. at 190.

[*P27]  Konczak never filed a formal complaint alleging that Garn's had or attempted to have sexual conduct or contact with her. Garn's was not indicted for any alleged sexual advance or crime in which Konczak was the alleged victim. Konczak testified that she never contacted Garn after she was released from jail. (4T. at 120). She never heard from Garn again. (4T. at 133). When asked why she had come forward, Konczak testified

> I just spoke with another female that was telling me a story about Officer Garn. And it really kind of broke my heart, and I didn't want

41

her to go through it alone. So she asked if she could tell my story,
and I told her yes. I don't have anything to hide.

4T. at 121-122.

[*P28] The evidence presented at the hearing on Garn's PCR petition, if believed,
showed that Konczak might have lied to the inmates. Shortly thereafter Konczak
had compunction of conscience, an awareness of the wrongfulness of lying. (2PCR
T. at 231). She was repentant and immediately confessed her lies to those whom
she had told. Both, Chinn and Shriner testified that Konczak was very upset and
crying when she confessed that she had lied. (2 PCR T. at 213; 234; 4PCR T. at
497; 504). In contrast, Konczak never recanted the allegations that she made during
her trial testimony.

[*P29] Aside from the multiple layers of hearsay contained in both the exhibit and
the testimony of Chinn and Schriner, the impeachment evidence as suggested by
Garn does nothing to impeach or call into question the testimony presented at trial
that Garn failed to submit the heroin to the crime laboratory for analysis. The jury
heard Garn testify that he field tested the substance. Because he determined that the
substance tested negative, he took it upon himself to throw it away and not charge
Konczak. By contrast, Special Agent Bryan Seamour from the FBI testified that
Garn never mentioned during his interview with the FBI that he had conducted a
field test of the substance removed from the pill bottle found in Konczak's purse by
Corrections Officer Hout. (4T. at 213; 216). Apparently, the field test had been
done in solitude as no other witness testified to seeing the test, the results or the
destruction of the evidence. The jury had only Garn's word that the substance has
been destroyed.

[*P30] The record contains competent, credible evidence that the proper protocol
even when a field test yields a negative result is to submit the substance to the crime
laboratory for a definitive analysis. (4T. at 190; 6T. at 619-620; 7T. at 783). The
focus was correctly on Garn's actions in disposing of the evidence instead of
logging it into evidence and submitting it to the crime lab. There is no credible
argument that Konczak could "make up" those allegations.

[*P31] In Garn's direct appeal, we found that,
> Viewing the evidence in a light most favorable to the prosecution, we find
> the jury did not lose it's way in finding the essential elements of tampering
> with evidence proven beyond a reasonable doubt.

*Garn*, I at ¶62.

[*P32] Whether Konczak told inmates at the jail that she had sexual contact or
sexual conduct with Garn in order to get out of jail and subsequently told inmates
at the jail that it was untrue, that evidence could not reasonably be taken to put the
whole case in such a different light as to undermine confidence in the verdict.

### 2]. Krystal Sawyer.

[*P33]  Garn also argued that Ms. Schriner and Ms. Chin testified at the hearing as to Krystal Sawyer reputation for untruthfulness around the jail. However, Garn's Exhibit One does not state that Krystal Sawyer said she made up the allegations5. There is nothing about Krystal Sawyer in the memorandum other than that she was telling people that Garn had raped her and there was a big investigation into the allegation. She told Garn's trial attorney and Garn's private investigator the same details almost one year before the trial began in Garn's case. (1 PCR T. at 78; State's Exhibit 2). In addition, Ms. Shriner testified that she never heard Ms. Sawyer say that she was lying or ever heard of anything to indicate that she was lying. (2PCR T. at 230-231).

[*P34]  Assistant prosecutor Omar Siddiq testified that he talked with Krystal Sawyer a little bit about whether she recanted and how and what was going on. (3PCR T. at 327-328). When asked if Sawyer took back her allegations, Siddiq testified that,

> Ultimately, no. She stuck with it. We had to have a long conversation about what took place and why that took place and told her that she would have to explain that on the stand and ultimately the jury would have to believe that she did that just to change her bond or not.

3PCR T. at 328.

[*P35]  Garn's counsel questioned Ms. Sawyer about her attempt to recant her allegations at trial. (6T. at 480). However, as Ms. Sawyer testified at trial her threatened recantation was because she believed her $100,000 bond on a felony of the fifth-degree was a direct result of her allegations against Garn and she thought recanting would allow her to get out of jail. (6T. at 478-480).

[*P36]  Trial counsel for Garn and private investigators hired by Garn met with Sawyer June 4, 20156. (1PCR T. at 78; State's Exhibit 2). Sawyer reiterated the details of her encounter with Garn during that interview. (State's Exhibit 2). Her testimony at trial was consistent with those details. In addition, Sawyer told counsel and the investigators that "she might have told people that she made this all up but she did not". (1PCR T. at 78-79; State's Exhibit 2).

[*P37]  In *State v. Ketterer*, the Ohio Supreme Court found,

> Even assuming that Ketterer was entitled to such information, Ketterer knew about most of this information before his resentencing hearing. *See State v. LaMar*, 95 Ohio St. 3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 28, fn. 2 (no *Brady* violation occurs where a defendant knows of essential facts permitting him to take

43

> advantage of exculpatory information or where evidence is available from another source), citing *United States v. Clark* (C.A.6, 1991), 928 F.2d 733, 738; *see also State v. Iacona* (2001), 93 Ohio St. 3d 83, 100, 2001- Ohio 1292, 752 N.E.2d 937, quoting *United States v. Smith Grading & Paving, Inc.* (C.A.4, 1985), 760 F.2d 527, 532 ("'No due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial'").

126 Ohio St. 3d 448, 2010-Ohio-3831, 935 N.E.2d 9, ¶ 36.

[*P38] Accordingly, based upon the foregoing, the trial court did not abuse its discretion in finding that the state's failure to disclose the evidence set forth in Garn's Exhibit One and presented at the evidentiary hearing was not a Brady violation. The impeachment evidence as presented by Garn cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

[*P39]  Garn was not denied his right to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

*State v. Garn*, 2019-Ohio-1604, ¶¶19-39.

Garn focuses the crux of the exhibit's importance on how the report indicated that Ms. Konczak's fellow inmates overheard and were told by Ms. Konczak that she fabricated her allegations. Yet, Garn first fails to address the trial court's finding that the report and the testimony of Schriner and Chinn would likely face substantial admissibility issues due to multiple layers of hearsay. "[F]or withheld evidence to be material for *Brady* purposes, it must either be admissible or lead directly to admissible evidence." *Sawyer v. Hofbauer*, 399 F.3d 605 (6th Cir. 2002).

Next, while Garn contends that Ms. Schriner and Ms. Chinn would testify that Ms. Konczak herself was lying and thus would impeach both Ms. Konczak's and Ms. Sawyer's credibility, Garn fails to address the fact that Ms. Konczak did not recant her allegations. In a failed attempt to establish materiality (excluding the arguments barred by *res judicata*), Garn contends that the appellate court relied on Ms. Konczak's testimony to establish the sufficiency of the evidence regarding tampering with evidence charge. However, whether Ms. Konczak fabricated

44

sexual allegations has no bearing on Ms.  Konczak's testimony to the jury that Garn failed to submit the heroin to the crime laboratory for analysis. Garn himself testified that he determined the substance to be negative, threw the substance away, and did not charge Ms. Konczak. (*See* ECF Doc. 9-8, PageID#2193).

Furthermore, FBI Special Agent Bryan Seamour testified that Garn never mentioned during his interview with the FBI that he had conducted a field test of the substance removed from the pill bottle found in Ms. Konczak's purse by Corrections Officer Hout. (ECF Doc. 9-4, PageID#1204, 1207). No witnesses testified to seeing the test, the results, or Garn's destruction of the evidence. Finally, there was testimony in the record indicating that the proper protocol - even when a field test yields a negative result - is to submit the evidence to a crime laboratory for a definitive analysis. (ECF Doc. 9-4, 1181; ECF Doc. 9-6, PageID#1552-53; ECF Doc. 9-7, PageID#1847). As the state appellate court concluded, "there is no credible argument that Ms. Konczak could "make up" those allegations." Thus, Garn has failed to demonstrate how this evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

In his traverse, Garn asserts that the State  failed to establish that the substance in question was an illegal substance. (*See* ECF Doc. 14, PageID#2591). Yet, Garn fails to establish at all how the illicit—or  legal—nature of the substance has any bearing on his *Brady* violation argument.

Garn lodges a new argument in his traverse, asserting that there is no separate, different, or higher standard for law enforcement officers, and no departmental policy creates additional elements under the statute. (*Id.* at 2952). Thus, Garn asserts that there is no evidence in the record to meet the third element of Garn's tampering with evidence charge. (*See id.*).  But Garn wholly failed to raise these arguments concerning the third element of his tampering with evidence charge

45

in his merits brief (*See* ECF Doc. 1-2, PageID#52-56), and he failed to raise them in his direct appeal. (*See* ECF Doc. 7-1, PageID#261-62). "New issues may not be raised in the traverse." *McClendon v. Wainwright*, No. 1:17 CV 0589, 2018 WL 7982929, at *3 (N.D. Ohio Nov. 13, 2018), *report and recommendation adopted*, No. 1:17 CV 589, 2019 WL 1558739 (N.D. Ohio Apr. 10, 2019) (citing *Burns v. Lafler*, 328 F. Supp. 2d 711, 724 (E.D. Mich. 2004) (citation omitted) ("[A] court cannot consider new issues raised in a traverse or reply to the State's answer.")). Thus, this Report and Recommendation need not address these arguments. Accordingly, I recommend that the Court reject this portion of Garn's assignment of error.

### 3. *Exhibits Seven (Letter to FBI from Former County Prosecutor Couch-Page) and Eight (Lieutenant Stortz's Report)*

The majority of Garn's arguments appear to revolve around the Fifth District's determination that the non-disclosure of former County Prosecutor Couch-Page's draft letter to the FBI (Exhibit 7) and Lieutenant Stortz's report (Exhibit 8) did not constitute a *Brady* or *Napue* violation.[14] (ECF Doc. 1-2, PageID#56). Regarding the FBI letter, Garn asserts that the non-disclosure of the letter was a *Napue* violation because it revealed that the Richland County Prosecutor's Office was aware of and present for a number of witness interviews containing conflicting statements. (*Id.* at 57). Garn asserts that this draft letter is "suggestive" of the existence of multiple interviews in which witnesses allegedly lied. (*Id.*). He points to the following as evidence of an unconstitutional withholding of evidence of multiple interviews:

- ***Bambi Couch-Page***
  - The State stipulated that Couch-Page drafted the letter and the trial court accepted the stipulation. Her handwriting was discovered to be affixed to

---

[14] As stated above, the organization of Garn's merits brief and traverse make it unclear what specific determination from the Ohio Court of Appeals he now challenges. Given that all these arguments appear to revolve around the alleged existence of phone calls or interviews with  victims that were not provided by the State, this appears to be a challenge to the state appellate court's determination that the non-disclosure of Exhibits 7 and 8 was not a *Brady*/*Napue* violation.

       the original letter requesting that her administrative assistant proof the letter and get the proper address. (ECF Doc. 9-11, PageID#2698).

o  Couch-Page testified, "I don't know what the factual circumstances were that had been relayed to the person who drafted the letter or the assumptions that might have been made by that individual…I can't tell you why that person wrote what they did." (ECF Doc. 9-10, PageID#2587).

o  When asked by her own office about her conduct, her written reply was that she was entitled to sovereign immunity. (ECF Doc. 9-10, PageID#2592)

Based on Bambi Couch-Page's ("Ms. Couch-Page's") testimony that she was unaware or unable to recollect that the FBI draft letter, Garn contends that the "only logical conclusion is that [Couch-Page] indeed drafted [the letter] is persuasive of [her] willingness to deny knowledge of information for which she is wholly privy to." (ECF Doc. 14, PageID#2598). He states that it further casts doubt on her denial of having knowledge or inability to recollect: (1) Lieutenant Petrycki's memo; (2) Ms. Sawyer's recantation; (3) whether STEP logs were missing; and (4) her meeting with the FBI about the petitioner. (*Id.*).

    Garn then points to a January 2015 report from "Lieutenant Petrycki stating that 'Detective Deitrich contacted me after her meeting with Krystal Sawyer.'"[15] (ECF Doc. 1-2, PageID#58). He asserts that this report indicates that on or about January 15, 2015, Ms. Sawyer was contacted regarding allegations about him. (*Id.*). He states that no such report was provided to his counsel, and that the State should have turned over witness statements. (ECF Doc. 1-2, PageID#58; ECF Doc. 7-1, PageID#476-78). He points to other testimony as proof that phone calls took place with Ms. Sawyer:

- ***Lieutenant Joy Stortz***
  - o  Lieutenant Joy Stortz testified that there were recorded calls to METRICH from Krystal Sawyer to Stortz about Sawyer's "feelings on this matter with regard to her bond a new case." (ECF Doc. 1-2, PageID#58) (citing ECF

---

[15] Garn did not provide a citation to this specific exhibit in his merits brief or traverse. He later refers to Exhibit 6 from his post-conviction petition as support that he was not provided this report. Based on that cited exhibit, it is unclear whether he is referring to Lieutenant Petrycki or Lieutenant Stortz. Based on my independent review, it appears that Garn is attempting to reference Exhibit 8 of his post-conviction petition (the "Garn Complaint"), which is an alleged report from Lieutenant Stortz, not Lieutenant Petrycki. (*See* ECF Doc. 7-1, PageID#481-83).

Doc. 9-11, PageID#2689-90). This call was not disclosed to defense counsel. (ECF Doc. 9-11, PageID#2689-90).

- o Stortz testified at the PCR hearing that she told Couch-Page about the phone calls.[16]

- **Prosecutor Bambi Couch-Page**
  - o Couch-Page testified that "there were clearly multiple interviews," despite, Garn contends, only one interview being provided to counsel for defendant.[17]

- **Sergeant Chad Brubaker**
  - o Brubaker testified that in November or December 2014, Lieutenant Stortz instructed him to go to the jail to speak with Sawyer because, "Miss Sawyer was upset that and there was a rumor or somebody was saying that she was going to change her story about the statement she gave." (ECF Doc. 9-11, PageID#2707).
  - o He also testified that he "maybe talked" with Prosecutor Couch-Page about this conversation. (*Id.* at 2708).

Garn argues that he requested copies of the recorded jail calls, but was told the copies were no longer retained. Specifically, he points to testimony at a hearing on Garn's motion to compel discovery in July 2017 where the State stated that it "had no such evidence." (ECF Doc. 9-2, PageID#1025).

As further evidence of the Richland County Prosecutor's Office's awareness that multiple interviews were not turned over, he provides the following testimony from First Assistant Prosecutor Cliff Murphy as support:

- Cliff Murphy testified that he "talked to the victims of this particular defendant." (ECF Doc. 9-12, PageID#2846).
- He stated that "[Prosecutor Siddiq] talked to witnesses that he was going to, I guess, question, would be the way that I would say it...I had talked to all the witnesses before then." (*Id.* at 2848).
- When asked if he would expect to receive a report from law enforcement officers of victims attempting to recant, Murphy testified that "I'm not their chain of command." (*Id.* at 2848-49).
- When asked if it would surprise him that Sergeant Brubaker did not make a report that Sawyer tried to recant, he replied "That's a police issue, not a prosecutor issue." (*Id.* at 2849).

---

[16] It is unclear where in the transcript this testimony is because Garn failed to provide a citation to this testimony in his merits brief and traverse. (*See* ECF Doc. 14, PageID#2957).

[17] Garn fails to provide a specific record citation for this quote in his merits brief and traverse. (*See* ECF Doc. 1-2, PageID#59; ECF Doc. 14, PageID#2957).

- Regarding Brubaker's failure to make a report regarding Sawyer's recantation attempt, Murphy testified "I'm not Sergeant Brubaker, I don't know what he knows. I don't know what his life experience is, I'm not a police officer. I don't play one on T.V. either. What it comes down to is, is if he thought it was important enough to generate a police report, if he thought it was credible enough to generate a police report, I would imagine someone who was a sergeant would have generated a police report. He may have very well thought it wasn't something that important." (*Id.* at 2851).

Based on these answers, Garn contends that it evidences Prosecutor's Murphy's "lack of awareness of the United States Supreme Court holding with regard to his obligation as a prosecutor, it show[s] wanton disregard for a good-faith pursuit of justice." (ECF Doc. 14, PageID#2959). According to Garn, he "surely" should have been aware of Supreme Court holdings that witness statements to the police are always material for the purpose of *Brady* when witness testimony is the only evidence linking the defendant to the crime, and the State's affirmative duty to learn of material evidence known to other agencies investigating on the State's behalf. (*Id.*). Further, he contends that Prosecutor Murphy was "clearly not aware of his obligation with regard to his obligation to disclose evidence to the defense." (*Id.* at 2960). Garn argues that Prosecutor's Murphy's statement "indicates that Prosecutor Murphy believes it is the police officer's role, rather than the jury's charge, to determine the credibility of witness testimony." (*Id.*). Thus, in operating in this manner, Garn maintains that the Richland County Prosecutor's Office's "fatally flawed understanding of due process has without question undermined the credibility of the convictions in this case." (*Id.*).

Garn then points to the testimony of Assistant Prosecutor Omar Siddiq as evidence that the Richland County Prosecutor's Office withheld favorable statements from recanting witnesses. Specifically, he points to the following testimony:

- Siddiq stated that he "talked [with Sawyer] a little bit about whether she recanted and how and what was going on[.]" (ECF Doc. 9-11, PageID#2604).
- When asked if Sawyer took back her allegations, Siddiq testified, "Ultimately, no. She stuck with it. We had to have a long conversation about what took place and why that took place and told her that she would have to explain that on the stand and ultimately the jury

would have to believe that she did that just to change her bond or not." (ECF Doc. 9-11, PageID#2605).

Garn asserts that Prosecutor Siddiq's response of "Ultimately, no." is an admission that Ms. Sawyer recanted "until they convinced her to stick with her original story, regardless of whether it was t[ru]e." (ECF Doc. 14, PageID#2960). Garn states that is unclear what "long conversation" Prosecutor Siddiq may have had, but "certainly efforts to dissuade her from recantation should have been disclosed and were knowingly withheld." (*Id.* at 2961-62). Finally, he points to later testimony from Prosecutor Siddiq where he testified that he was present for one interview with Ms. Sawyer, "presumably with law enforcement." (ECF Doc. 14, PageID#2961) (citing ECF Doc. 9-11, PageID#2615).[18]

In summary, Garn asserts that the post-conviction hearing testimony reveals testimonial evidence from State witnesses that revealed the following favorable information:

- Ms. Sawyer made recorded phone calls to Lieutenant Stortz that were not turned over.
- Lieutenant Stortz called Couch-Page to discuss those calls.
- Ms. Sawyer attempted to recant to Sergeant Brubaker.
- Couch-Page ordered that Brubaker interview Ms. Sawyer about her recantation instead of Lieutenant Stortz.
- Ms. Sawyer was interview about her lack of fear of Garn by Officer Deitrich.
- Ms. Sawyer's attempt to recant was communicated to Couch-Page by Lieutenant Stortz.
- Ms. Kim Vandayburg's statement exculpated Garn, as she stated that he pulled her over lawfully.[19]
- Ms. Jamie Woods's statement exculpated Garn because she was pulled over lawfully and Captain Snavely indicated that he personally communicated this information to Couch-Page.
- Prosecutor Murphy interviewed every witness in this case and failed to disclose the information obtained.
- Prosecutor Siddiq interviewed every witness for which he handled direct examination and failed to disclose to the State.

---

[18] It is unclear how Garn reached the conclusion that Prosecutor Siddiq met with Ms. Sawyer "presumably with law enforcement." (ECF Doc. 14, PageID#2961). The transcript Garn cites indicates that Prosecutor Siddiq testified that the FBI was not present at that interview. (ECF Doc. 9-11, PageID#2615).

[19] Garn does not provide a citation to this statement in his merits brief or traverse.

Thus, he contends these alleged withholdings are "substantial and exhibit bad-faith and intentional wrongdoing." (*Id.* at 63). He asserts that the allegedly withheld information was favorable for purposes of guilt and sentencing, and that but for the withholding of this information, this case would have resulted in an acquittal. (*Id.*).

Finally, Garn contends that the cross-examination of Ms. Sawyer does not cure the State's alleged *Brady/Napue* violation. Garn contends that the State did not apply the appropriate legal standard in asserting that, because Ms. Sawyer was asked on cross whether she attempted to recant her statement during trial, that this issue was "fleshed out at trial."[20] (*Id.*). Garn argues that the fact that counsel was able to ask Ms. Sawyer whether she attempted to recant does not cure the State's withholding of material evidence under *Brady* and its progeny. (*Id.*). First, Garn contends that his trial counsel only had a basis for that information as the result of her own interview of Sawyer. (*Id.*). He argues that his counsel was denied the ability to cross-examine Sawyer about what was said to defense counsel - versus what was said to Lieutenant Stortz, Sergeant Brubaker, Prosecutor Siddiq, or Prosecutor Murphy - about the same recantation. (*Id.*). Garn contends that the recorded jail calls allegedly contained content in which Sawyer was "so irate" that Lieutenant Stortz was unable to calm her or reason with her. (*Id.* at 64). He contends that the calls gave Lieutenant Stortz so much cause for concern that she called then-Prosecutor Bambi Couch-Page. (*Id.*). Thus, Garn asserts that the State's non-disclosure was of such a nature that it "permanently denied" Garn the right to review those recordings made between a law enforcement officer and the sole witness of a crime for which he was charged. (*Id.*).

Although it is unclear from the structure of Garn's merits brief and traverse, the Court construes Garn's argument to be attacking the appellate court's findings regarding Exhibits Seven

---

[20] Garn's argument appears to be a response to an argument that the State made in earlier briefs made to the trial court, not an argument made by the State in its return of writ.

and Eight. The Ohio Court of Appeals determined the following regarding and alleged *Brady* violation:

> *2). Exhibit 7 — letter to the FBI from then Richland County Prosecutor Bambi Couch-Page.[21]*
>
> [*P40]  Garn's Exhibit Seven is a letter dated July 22, 2015 that purports to be to the FBI from then Richland County Prosecutor Bambi Couch-Page. It appears to be in response to a "*Touhy*" request for the testimony of Agent Fisher.8 (PCR Exhibit 18).
>
> [*P41]  The state entered into a stipulation that "Defendant's Exhibit 7 [the FBI draft letter] was created by Miss Couch-Page or at her direction." (4PCR T. at 421-422).
>
> ### *a)). Garn's arguments concerning Exhibit Seven.*
>
> [*P42]  Garn contends, "the state was aware of or in possession of, a number of interviews in which the witnesses failed to inculpate Mr. Garn. This is evidenced by the FBI Draft letter authored by Bambi Couch Page. Further, a January 15, 2015 report by Lt. Petrycki states that 'Detective Deitrich contacted me after her meeting with Krystal Sawyer. The report indicates that on or about January 15, 2015 Sawyer was contacted regarding her allegations against Mr. Garn. No such statement or summary was turned over to the defense. (PC Exhibit 6)." *Merit Brief For Appellant*, filed Nov. 20. 2018 at 9.
>
> [*P43]  Garn further argues, "The FBI draft letter provided through a public records request indicates that favorable evidence was withheld by the state. It is the contents of the FBI letter authored by Couch Page that violate both *Brady* and *Napue* as the letter evidences an awareness of 'multiple interviews' which included admissions by witnesses that they "lied." (PC Exhibit 7). Additionally, it notes that there were multiple "version of events" provided to law enforcement. The letter also states that "upon first interview, many of the witnesses were reluctant to provide any sort of inculpating information involving the defendant's criminal conduct." *Id*. The state supplied one inculpatory interview from each witness victim and withheld any and all interviews or summaries where witnesses/victims refused to inculpate Mr. Garn and/or provided a different version of events. *Kyles* is clear that due process requires disclosure of evidence that provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation to impeach the credibility of the state's witness or to bolster the defense's case against prosecutorial attacks. 514 U.S. at 445-446." *Merit Brief For Appellant*, filed Nov. 20, 2018 at 28.
>
> ### *b)). Competent, credible evidence supports the trial court's decision that non-disclosure of Exhibit Seven did not violate Garn's due process rights to a fair*

---

[21] Garn's Exhibits 2 through 6 were affidavits that were not offered into evidence during the PCR hearing.

*trial; the evidence cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.*

[\*P44]  Garn's Exhibit 7 is not substantive evidence that Brady material exists. The record contains competent, credible evidence that the letter was never signed and mailed to the FBI. (4PCR T. 533). The record contains competent, credible evidence that the letter was a draft, a work-in progress. (4PCR T. at 533-534; 536; 538). This is evidenced by the typographical errors as for example,

July 22, 2015

Federal Bureau of Investigation

**FIRST NAME??** Curtis

Associate Division Counsel

And, also,

**WRITE A DESCRIPTION OF AGENT FISHER'S INVOLEMENT AND EXPLAINT WHY WE NEED HIS TESTIMONY**

[\*P45]  None of the facts in the letter appear to be representative of the facts of Garn's case. Assistant Prosecutor at the time Clifford Murphy testified that the language appeared to have been taken from a previous case involving human trafficking in which the prosecutor's office had recently sent a *Touhy* letter to the FBI. (4PCR T. 533-537).

[\*P46]  Assistant Prosecutor at the time Clifford Murphy testified that he spoke with either Special Agent Fisher or Seamour and asked if the FBI did anything else in Garn's case, to which the agent replied, "No." (4PCR T. at 539-540).

[\*P47]  The record contains competent, credible evidence that the FBI turned over all exculpatory evidence in its possession to the prosecutor's office, who in turn gave it to defense counsel in Garn's case. State's Exhibit One is a letter from Special Agent Gregory Curtis stating that the FBI "provided all relevant information related to the Michael Garn investigation (including but not limited to *Brady*, *Jencks*, or *Giglio* material)." This document was given to defense counsel. (4PCR T. at 539).

[\*P48]  Special Agent Bryan Seamour testified during Garn's jury trial. Seamour testified that he and Special Agent Grady Fisher conducted a tape-recorder interview of Garn. (4T. at 206). Seamour did not testify that he or Special Agent Grady had interviewed any other witness. A transcript of the interview was given to defense counsel.

53

[*P49]  With respect to Krystal Sawyer, Assistant Prosecutor at the time Omar Siddiq testified that he met with Krystal Sawyer when she was incarcerated in order to prepare for Garn's upcoming trial. (3PCR T. at 326). Sawyer never indicated that she had been interviewed by the FBI to Siddiq. (3PCR T. at 326). He further testified to the best of his knowledge, the only person the FBI interviewed was Garn. (3PCR T. at 326-327). Around January 8, 2015, Sawyer had been arrested and taken to jail. (3T. at 368). Siddiq testified that Sawyer threatened to recant her allegations because Sawyer believed that her bond in the new case was set too high. (3PCR T. at 327). She believed it was because of her involvement in Garn's case. (3PCR T. at 328-329). Siddiq believed that Sawyer would testify truthfully at trial. (3PCR T. at 342).

[*P50]  Lieutenant Joy Stortz testified that she spoke to Sawyer in reference to Sawyer overdosing on drugs. (3PCR T. at 366-367). The meeting did not occur in the jail. (3PCR T. at 367). Nor did Lt. Stortz take a statement from Sawyer in preparing her report dated January 8, 2015. (3PCR T. at 369; 380; Garn's Exhibit 8).

[*P51]  Lieutenant Chad Brubaker testified that he met with Sawyer at the jail to investigate whether Sawyer wanted to recant her allegations against Garn. (3PCR T. at 429-430). Sawyer was upset and threatening to recant because her bond was so high. (3PCR T. at 432). Lt. Brubaker specifically testified,

[*P52]  But then I flat out asked her myself. I said, are you telling — are you telling anybody that you're lying, that you lied about a statement that you had given? And she said, "No, I told the truth."

3PCR T. at 431. Lieutenant Brubaker further testified,

> She didn't want to recant her story. If she would have told me, no, I didn't tell the truth in that statement, then we would have took [sic.] a second statement from her then.

3PCR T. at 434. Finally, Lieutenant Brubaker testified,

> Q. And did you say anything to convince her not to change her story? Did you tell her — well, strike that.
>
> You explained to Krystal Sawyer that you could do nothing about her bond. Is that  correct?
>
> [Lt. Brubaker]: Correct.
>
> Q. And at that point, did Krystal Sawyer say that she had been telling the truth?
>
> [Lt. Brubaker]: Yes. I asked her, and she said she had told the truth.

3PCR T. at 435.

 [*P53]  State's Exhibit 2 is an Interview Summary prepared by the Lycurgus Group, LLC, the private investigators that were hired by Garn. An investigator, Michael Taylor, met with Krystal Sawyer at the Marysville Reformatory for Women on June 4, 2015. Sawyer told Taylor the same allegations she had made concerning Garn when describing for Taylor what Garn had done to her. (State's Exhibit 2). Importantly, Taylor noted, "Krystal said she might have told people she made this all up but she did not." (State's Exhibit 2). Garn's trial counsel admitted she was present during the interview of Krystal Sawyer on June 4, 2015. (1PCR T. at 53; 78).

 [*P54]  Further, Defense Counsel inquired into Sawyer's recantation during Garn's trial,

> [Ms. Corral]: At a later date, did you tell a corrections officer that you tried to recant your story but they wouldn't let you?
>
> [Sawyer]: No. I wanted to recant because I was in there on a felony five and my bond was $100,000. I thought that's the reason why I was in jail for — I couldn't get a good bond that I could pay because—
>
> [Ms. Corral]: Okay. But the question is, did you tell a corrections officer that you tried to recant?
>
> * * *
>
> [Ms. Corral]: My follow-up is, did you tell a corrections officer that you wanted to recant?
>
> [Sawyer]: Yes.
>
> * * *
>
> [Prosecutor Siddiq]: And the one time, as defense counsel says, that you asked to recant your statement was because you were in jail?
>
> [Sawyer]: Yes.
>
> [Prosecutor Siddiq]: Why did you feel recanting would help you?
>
> [Sawyer]: Because I thought that he was cool with everybody up here, so I thought maybe if I told them that it didn't happen, that maybe they would lower my bond.
>
> [Prosecutor Siddiq]: Because you wanted to get out.

[Sawyer]: Yes.

[Prosecutor Siddiq]: And you thought that recanting your story would help you.

[Sawyer]: Yes. Get out of jail.

[Prosecutor Siddiq]: Did you want to recant because it didn't happen?

[Sawyer]: No.

[Prosecutor Siddiq]: Did you want to recant because you were making it up?

[Sawyer]: No. I wanted to get out because I missed my kids. I didn't understand why my bond was so high. Even the CO said that they'd never seen that. And I asked people, Do you know of other inmates? And they said, Krystal, you know, if you tell them--

MS. CORRAL: Objection.

* * *

[Sawyer]: The conclusion I got from, you know, gathering information was that if I said that, you know, it didn't happen -- because I thought it was his friends up here at the courthouse, you know he works with people up here. So I thought maybe it would help.

 [*P55]  6T. at 478-480.

 [*P56]  Chief Kenneth Coontz testified that the only interview the FBI conducted was with Garn. (3PCR T. at 483).

 [*P57]  We find that the defense was aware nearly one year before the start of Garn's jury trial that Sawyer might have told people she made this all up but she did not. See, *State v. Ketterer*, 126 Ohio St. 3d 448, 2010-Ohio-3831, 935 N.E.2d 9, ¶ 36 ("no Brady violation occurs where a defendant knows of essential facts permitting him to take advantage of exculpatory information or where evidence is available from another source." citing *United States v. Clark* (C.A.6, 1991), 928 F.2d 733, 738). We find no credible, substantive evidence that there were multiple witnesses who had attempted to recant, or had lied, or had failed to inculpate Garn.

[*P58]  We find the record contains competent, credible evidence to support the trial court's decision. The evidence as presented by Garn cannot reasonably be taken in to put the whole case in such a different light as to undermine confidence in the verdict.

[*P59]  Therefore, the trial court did not abuse its discretion in finding that any failure to provide Garn's Exhibit Seven, or the information contained therein, to the defense was not a *Brady* violation. Garn was not denied his right to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

*State v. Garn*, 2019-Ohio-1604, ¶¶40-59.

The Ohio Court of Appeals determined the following regarding the alleged *Napue* violation

for Exhibit 7:

[*P96] Garn's Exhibit Seven does not support any inference that the state knowingly used false testimony or knowingly allowed false testimony to go uncorrected. The document is clearly a draft that was never revised, signed or sent by the state. There is no evidence that Exhibit Seven was ever received by the FBI. As a draft it was subject to revision and editing. Stewart told defense and the private investigators about possibly telling others that she had lied nearly one year before trial. The defense did in fact question her on this subject at trial.

[*P97] The defense questioned Kelly Harding at trial concerning her reluctance to testify and her desire to recant. Harding testified that she was telling the truth. (4T. at 263-264). The defense was aware of Ms. Harding's attempt to recant and cross-examined her on that subject at trial. (4T. at 256-258; 260; 263).

[*P98] There is no evidence that the state failed to provide material evidence concerning any other witness. No affidavits, depositions or testimony from any of the trial witnesses was presented during the hearing on Garn's PCR petition.

*State v. Garn*, 2019-Ohio-1604, ¶¶ 96-98.

The Ohio appellate court did not reach an unreasonable conclusion. The state appellate court previously addressed several arguments that Garn now rehashes in his merits brief. Specifically, the state appellate court addressed Garn's contention that there was evidence that the State allegedly only provided one interview and withheld several other interviews. The state appellate court concluded that Exhibit 7 did not demonstrate evidence that *Brady* material existed. In doing so, the state appellate court extensively laid out the facts in explaining how it reached its

conclusion that Exhibit 7 did not demonstrate that *Brady* material existed. And Garn's citations to the record do not demonstrate the existence of *Brady* material. Furthermore, the state appellate court determined that Garn had failed to establish an inference that the State knowingly used or allowed false testimony at trial. As the appellate court pointed out, Garn's trial counsel knew one year prior to trial about Ms. Sawyer's attempt to recant, and even cross-examined her regarding this issue. Similarly, Garn's trial counsel also cross-examined Ms. Harding at trial regarding her reluctance to testify and her desire to recant, to which she responded that she was telling the truth. This strongly suggests that Garn's trial counsel was aware of these facts prior to trial.

Moreover, regarding Garn's contention that Ms. Sawyer's cross-examination does not cure the *Brady* violation, the Ohio appellate court applied the correct legal standard and reached a reasonable conclusion. There is no *Brady* violation where the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information or where the evidence is available to the defendant from another source. *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991). Significantly, Garn does not rebut the trial court's factual findings that his trial counsel was aware ***nearly one year prior to Garn's jury trial*** that Sawyer may have told people she "made this all up," but she in fact had not. *State v. Garn*, 2019-Ohio-1604, ¶36, 96. Additionally, the state appellate court also found that Garn's trial counsel admitted she was present during an interview of Ms. Sawyer on June 4, 2015, and heard Ms. Sawyer make this statement. *Id.* at ¶36, 53. Defense counsel had the opportunity to cross-examine Ms. Sawyer regarding her attempt to recant her allegations at trial. *Id.* at ¶ 35. However, Ms. Sawyer testified that this was because she believed her $100,000 bond on a felony of the fifth-degree was a result of her allegations against Garn, and she thought recanting would allow her to get out of jail. *Id.* at ¶36.

Regarding Lieutenant's Stortz's report (Exhibit 8), the Ohio appellate court also addressed whether the State's withholding constituted a *Brady* violation. The court stated the following:

*3). Exhibit 8 — The "Garn Complaint" authored by Lieutenant Joy Stortz.*

[*P60]  An incident allegedly occurred around January 8, 2015 and Lt. Stortz noted on January 26, 2015 that the investigation had been closed without charges after the complaining witness could not be located. (3PCR T. 372-373). Garn's Exhibit 8 is one typewritten page. It is on plain paper with no letterhead. It does not contain a signature or a sworn verification.

[*P61]  The relevant portion of the summary provided that Lt. Stortz was told by J.W. that M.J. called and said that Garn had appeared looking for Krystal Sawyer and Krystal "is scared to death." M.J. would not name the individual who allegedly told her that Garn showed up at the relative's house. Lt. Stortz determined that Krystal Sawyer was incarcerated in the Richland County Jail. Lt. Stortz contacted Major Masi at the jail and he contacted Detective Stacy Dittrich and requested Detective Dittrich go into the jail and speak with Ms. Sawyer. Lt. Stortz noted that Krystal Sawyer was offered the opportunity to go into protective custody in the jail and that Ms. Sawyer declined the offer at the time.

[*P62]  Stortz never spoke to Sawyer concerning the events in Garn's Exhibit 8. (3PCR T. at 369).

### *a)). Garn's arguments concerning Exhibit Eight.*

[*P63]   Garn's trial attorney "never claimed" that State's Exhibit Eight was "exculpatory." (2PCR T. at 141). Trial counsel argued that the fact that Krystal turned down an offer to go into protective custody was "material." (2 PCR T. at 141). Counsel contended that the Exhibit evidences an interview with Sawyer that was not disclosed. (1PCR T. at 58-59; 62-63). Among Counsel's concerns were, "Why was she given an opportunity to go into protective custody?" and "What was the purpose of that meeting?"(1PCR T. 59).

### *b)). Competent, credible evidence supports the trial court's decision that non-disclosure of Exhibit Eight did not violate Garn's due process rights to a fair trial; the evidence cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.*

[*P64]  The record contains competent, credible evidence that protective custody while in jail meant being put in "isolation." (2PCR T. at 140; 273; 3PCR T. at 372). Further, the inmate in protective custody would not have the same level of privileges. (4PCR T. at 541). Accordingly, it is equally credible that a desire not to

go into protective custody means Sawyer did not want to be put into isolation or give up her jail privileges. It does mean Sawyer was not afraid of Garn. Further, Garn's Exhibit Eight is unclear as to whether Sawyer said she was "scared to death" or whether it was the third party whom was reporting to the officers making this claim.

[*P65]  In *Moore v. Illinois*, the United State Supreme Court noted,

> We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.

> 408 U.S. 786, 795, 92 S. Ct. 2562, 33 L. Ed. 2d 706 (1972).

The subject of whether undisclosed statements with Sawyer existed was extensively probed during the four-day evidentiary hearing on Garn's PCR petition. The record contains competent, credible evidence that the state did not fail to disclose evidence materially favorable to Garn with respect to statements made by Sawyer or interviews conducted with Sawyer by law enforcement or the prosecutor's office. Garn's trial counsel and private investigators personally met and interviewed Krystal Sawyer on June 4, 2015. (PCR T. at 53; 78; State's Exhibit 29). We find no credible, substantive evidence that there were multiple witnesses who had attempted to recant, or had lied, or had failed to inculpate Garn.

[*P66]  Accordingly, based upon the foregoing, the trial court did not abuse its discretion in finding that the state's failure to disclose the evidence set forth in Garn's Exhibit Eight and presented at the evidentiary hearing was not a *Brady* violation. The evidence as presented by Garn cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

[*P67]  Garn was not denied his right to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

*State v. Garn*, 2019-Ohio-1604, ¶¶60-67.

Garn has failed to explain how the state appellate court reached an unreasonable conclusion in finding that the State's alleged withholding of the Lieutenant Stortz's report was not a *Brady* violation. (*See* ECF Doc. 1-2, PageID#58-59). Thus, I recommend that the Court reject Garn's sub-claims.

#### 4. Kelly Harding Testimony/Cross-Examination

Garn asserts that his defense counsel made "significant effort" to enter into evidence that Kelly Harding ("Harding" or "Ms. Harding") was afraid to recant her testimony because she was "threatened by the prosecution." (ECF Doc. 1-2, PageID#64). He contends that the trial court restricted his counsel's ability to inquire on whether the State threatened Ms. Harding with legal charges, limiting the inquiry to whether Ms. Harding was "afraid of legal consequences." (*Id.*). In response to this inquiry, Garn contends she responded "Yes." (*Id.*). In light of this testimony, Garn argues that his convictions regarding Ms. Harding should be reversed. (*Id.*). Garn further asserts that Prosecutor Siddiq interviewed every witness Siddiq handled at trial, including the direct-examination and redirect of Ms. Harding. (*Id.*). He further asserts that Prosecutor Murphy testified that he interviewed every witness or victim in his case, and Ms. Harding "could have been" interviewed by Prosecutor Couch-Page. (*Id.*). Garn argues that - had the State disclosed Ms. Harding's statements, recantations, and alleged threats - his defense counsel would have had a basis to question her "on the specific nature of the conversations which were had." (*Id.* at 65). Instead, he alleges the trial court "almost entirely restricted" trial counsel's ability to question. (*Id.*).

Garn's argument regarding the trial court's limitation of Ms. Harding's cross-examination is barred by the doctrine of *res judicata* because the state appellate court concluded that Garn failed to raise any error during his direct appeal regarding the trial court's alleged improper restriction of Ms. Harding's cross-examination. Specifically, the state appellate court set forth its reasoning as follows:

#### *bb)). Kelly Harding*

[*P121]  Garn argues, "One of Mr. Garn's responsibilities was traffic enforcement, known as the STEP program. One of the areas commonly used for that purpose was

61

close to Kelly Harding's home. (Tr. Vol. 7 at 112). After Mr. Garn stopped Harding for a traffic ticket, Mr. Garn started stopping over at her house, with increasing frequency after a while. (Tr. Vol. 4 at 239). The defense made significant efforts at trial to get into evidence that Harding was afraid to recant her testimony because she was threatened by the prosecution. (Tr. at 261). The state denied any knowledge of her recantation on record in response to defense counsel's motion to compel. (Tr. 37, 187, 202, 204, 211). Harding had testified in a prior deposition that she tried to recant but the state threatened her with legal charges.[22] (Tr 258). She did not know the prosecutors by name; however, she stated that it was a lady and a man. The threat was believed to be that they would put her into jail if she recanted. This Court meaningfully restricted defense counsel's ability to inquire on this matter, limiting the inquiry to whether she was afraid of "legal 'consequences." To which, she answered, "yes." (Tr. 263).

[*P122] "In light of the testimony at the post-conviction hearing referencing multiple interviews with witnesses who wanted to recant, Mr. Garn's conviction for Menacing by Stalking is highly suspect." *Merit Brief For Appellant*, filed Nov. 20, 2018 at 11-12.

### 1]. Garn failed to raise any error in the trial court's ruling concerning the cross-examination of Kelly Harding during his direct appeal.

[*P123]  At sidebar the state explained, "any statement the prosecutor would have made about that, as a witness, if you don't come and we subpoena you, we're going to put you in jail as a material witness. That's a common procedure, a common tactic. She's not sophisticated enough to understand the difference. The way it's going to come out is totally prejudicial and not probative in any way. (4T. at 259). The trial court ruled,

[*P124]  I think you can ask her why she ultimately did not take her statement back. *You can't get into what was said because it would be hearsay, but you can ask her, if she wanted to recant, why did she not recant...*
4T. at 260 (emphasis added). The defense then asked Harding,

> Q. There's been a little bit of time, but I'm going to ask you about your recantation. I think you said you can't take it back. Is that right?
> A. Right.
> Q. Were you afraid of legal ramifications if you took the statement back?
> A. Yes.

---

[22] No deposition testimony of Kelly Harding was entered into evidence at trial or during the hearing on the PCR petition. Nor was the deposition sealed and made a part of the record for purposes of appellate review. See, *State v. Hooks* (2001), 92 Ohio St.3d 83, 2001-Ohio-150, 748 N.E.2d 528(2001)(A reviewing court cannot add matter to the record before it that was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter.).

> 4T. at 263.

However, Harding immediately thereafter testified,

> Q. Miss Harding, the statement that you gave here today in court
> and the previous statements you've made, did you make any of that
> up?
> A. No.
> Q. Is it all the truth?
> A. Yes.
> Q. Did anyone ever tell you to come in here and tell anything other
> than the truth?
> A. No.

4T. at 263-264. In his direct appeal, we found Garn's convictions for offenses involving Kelly Harding were not against the manifest weight or the sufficiency of the evidence. *Garn, I* at 23; 54.

[*P125]  With respect to Ms. Harding, the jury found Garn not guilty of 3 LEADS violations (Counts One, Two and Four), Burglary (Count 32), Trespass (Count 33) and Attempted Gross Sexual Imposition (Count 34). In addition, the trial court granted Garn's Criminal Rule 29 motion for acquittal on Attempted Sexual Battery (Count 35). (8T. at 952-953).

 [*P126] The defense was aware of the recantation information and cross-examined Harding about her attempt to recant during Garn's jury trial. *See, State v. Ketterer*, 126 Ohio St. 3d 448, 2010-Ohio-3831, 935 N.E.2d 9, ¶ 36 ("no *Brady* violation occurs where a defendant knows of essential facts permitting him to take advantage of exculpatory information or where evidence is available from another source." *citing United States v. Clark* (C.A.6, 1991), 928 F.2d 733, 738). We find no credible, substantive evidence that there were multiple witnesses who had attempted to recant, or had lied, or had failed to inculpate Garn.

 [*P127]  Garn did not raise an assignment of error in his direct appeal that the trial court erred by improperly restricting his cross-examination of Harding. Therefore, any argument that the trial court erred in this respect is barred by res judicata.

*State v. Garn*, 2019-Ohio-1604, ¶¶120-27.

Garn has failed to address the state appellate court's application of the *res judicata* bar to this argument. (*See generally* ECF Doc. 1-2, PageID#64-64; ECF Doc. 14, PageID#2963-64). Significantly, the state appellate court found that Garn's defense counsel was aware of Ms. Harding's attempt to recant prior to trial, and Garn's counsel then cross-examined Ms. Harding on this issue during jury trial. (ECF Doc. 9-4, PageID#1250-51, 1254-55). Yet Garn failed to raise

this issue in his direct appeal. (*See* ECF Doc. 7-1, PageID#252-64). Thus, the appellate court properly applied the *res judicata* bar to Garn's argument regarding Harding's testimony/cross-examination.

Ohio courts regularly apply the doctrine of *res judicata* to foreclose review of claims that could have been or were raised in an earlier proceeding. *See, e.g.*, *State v. Perry*, 10 Ohio St. 2d 175, 226 N.E.2d 104 (Ohio 1967). And the Sixth Circuit has long held the application of *res judicata* to be an adequate and independent state ground to foreclose habeas relief in federal court. *See, e.g.*, *Landrum v. Mitchell*, 625 F. 3d 905, 934 (6th Cir. 2010). Here, Garn could have raised this issue in an earlier proceeding, but he chose not to do so. Accordingly, to the extent that Garn attempts to rely on this argument as a basis for habeas relief for his *Brady*/*Napue* claims, I recommend that the Court find that this argument is barred by *res judicata*.

### 5. Exhibits Eleven, Twelve, Thirteen, Fourteen, and Fifteen – LEADS Violations: Non-Disclosure of 2012 STEP Logs

Garn's next sub-claim is that the State failed to produce two 2012 STEP logs, which allegedly would have exculpated him. (*See* ECF Doc. 1-2, PageID#66-67).  Garn contends that the two 2012 STEP logs, referenced in Exhibit 12, that the State did not produce to defense counsel were in the police department's file and fully exculpated him. (*Id.* at 66). He asserts that the disputed STEP logs were provided after the trial pursuant to a public records request, despite Captain Brett Snavely's e-mail expressing that the 2012 STEP Logs did not exist. (*Id.*) He points out that Captain Snavely additionally testified that some of the logs were located. (*Id.* at 66-67). He asserts that "[i]f the Richland County Prosecutor's Office intended to pursue charges against [Garn] for LEADS violations in 2012, it was incumbent upon them to prevent the destruction of evidence." (*Id.* at 67).

While Garn acknowledges that the State dismissed the two LEADS counts related to his post-conviction petition in Exhibit 15, he contends that the State should not have indicted him on February 26, 2015 on these charges, which were not investigated until February 27, 2015. (*Id.*). He additionally contends that the State violated its discovery obligations and the law by failing to turn over evidence of his crime during the 15 months that these charges remained. (*Id.*). He also argues that is the State's actions evidence bad faith because the State continued to prosecute this charge for 15 months, knowing that he was innocent. (*Id.*).

Finally, Garn contends that Ms. Harding testified that she moved into her Fourth Street home in 2012. (*Id.* (citing ECF Doc. 9-4, PageID#1228)). He states that he adamantly maintained that he regularly did his STEP detail at the Fourth Street location outside Ms. Harding's house even before she moved in. (*Id.*). Because the evidence in the hearing showed that the State destroyed 2012 Step Log evidence, Garn contends that he was denied the ability to present a defense in the manner. (*Id.*). Citing *Kyles v. Whitley*, 514 U.S. 419, 436 (1995), Garn contends that the court is required the view the State's non-disclosures cumulatively. (*Id.*). While the State dismissed the charges relative to the two allegedly exculpating STEP logs, he contends that withholding this material still constitutes a violation. (*Id.*).  And he asserts that the court must consider the cumulative effect of the "State's bad faith, intentional withholdings." (*Id.*).

The Ohio Court of Appeals held the following regarding the alleged *Brady* violation:

> [*P81] **_b)). Competent, credible evidence supports the trial court's decision that non-disclosure of Exhibits Eleven, Twelve, Thirteen, Fourteen and Fifteen did not violate Garn's due process rights to a fair trial; the evidence cannot reasonable be taken to put the whole case in such a different light as to undermine confidence in the verdict_**.

> [*P82]  Lt. Stortz testified at the post-conviction hearing that she was given a list of names to follow up with regarding the LEADs violations. (3PCR T. at 374). As part of that investigation, she found that some of the original LEADS inquires that were thought to be violations were not. (3PCR T. at 376-377). Lt. Stortz testified

that she believed there were violations that she believed should not have been charged. Lt. Stortz found violations involving Allie Silliman that had not been charged as LEADS violations in Garn's case that Lt. Stortz felt should be charged. (3PCR T. art 375-376).

[*P83]  The state did not follow Lt. Stortz's urging. The state did not charge Garn with any LEADS violation regarding Allie Silliman nor did the state call her as a witness during Garn's trial. (4PCR T. at 547548; 550-553).

[*P84]  The only counts of the Indictment that occurred in 2012 were Count I, December 8, 2012, Kelly Harding and Count VIII, August 2, 2012, Kim McBride. The jury found Garn not guilty of Count I. (11T. at 1413). The state dismissed Count VIII before trial. (4PCRT at 544). Count VII concerning Jamie Wood was likewise dismissed by the state prior to trial. (4PCR T. at 544).

[*P85]  Sara Moser-Napier testified for the defense during Garn's trial. (8T. at 1013). She testified that she was assigned to the canine unit of the Mansfield Police Department. (8T. at 1020). Officer Moser-Napier worked and is friends with Garn. (8T. at 1014). Garn was not indicted or charged with a LEADS violation with respect to Officer Moser-Napier.

[*P86]  Based upon the evidence presented at trial, the jury found Garn guilty of Count XI a LEADS violation involving Mike Napier. (9T. at 1305; 11T. at 1414). *See, Garn, I* at ¶6; ¶33.

[*P87]  Competent, credible evidence was presented that no victim was "substituted." The record indicates that Lieutenant Joy Stortz urged the state to "substitute" Allie Silliman for Jamie Woods. (Garn's Exhibit 14; Garn's Exhibit 15; 3PCR T. at 374-377). She further advocated dismissing charges relating to Kim McBride, Sarah Moiser, Mike Napier and Jamie Wood. (3PCR T. at 385). However, the state did not charge Garn with any LEADS violation regarding Allie Silliman nor did the state call her as a witness during Garn's trial. (4PCR T. at 547-548; 550-553).Garn was not indicted or charged with a LEADS violation with respect to Officer Sarah Moser-Napier. The charges relating to Wood and McBride were dismissed before trial. Based upon the evidence presented at trial, the jury found Garner guilty of Count XI a LEADS violation involving Mike Napier. (9T. at 1305; 11T. at 1414). *See, Garn, I* at ¶6; ¶33.

[*P88]  Any delay in dismissing Count VII and Count VIII was attributable to the number of attorneys working on the case at any given time. (4PCR T. at 543-544; 553-557). The state further consulted their LEADS expert. (4PCR T. at 550-552). The state further made the LEADS CD/DVD available to the defense prior to trial. That item listed all of Garn's LEAD's searches for the preceding four to five years. (4PCR T. at 545). This would include legitimate and improper uses of the system. (4PCR T. at 567).

66

[*P89]  Accordingly, based upon the foregoing, the trial court did not abuse its discretion in finding that the state's failure to disclose the evidence set forth in Garn's Exhibits Eleven, Twelve, Thirteen, Fourteen and Fifteen and presented at the evidentiary hearing was not a *Brady* violation. The evidence as presented by Garn cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

[*P90]  Accordingly, Garn was not denied his right to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution by failing to turn over this evidence. The record contains competent, credible evidence that the state did not act in bad faith in failing to turn over any of the evidence relating to Garn's Exhibit Eleven, Twelve, Thirteen, Fourteen and Fifteen.

*State v. Garn*, 2019-Ohio-1604, ¶¶81-90.

Additionally, the Ohio Court of Appeals held the following regarding the alleged *Napue* violation:

[*P101]  Garn's Exhibits Eleven, Twelve and Thirteen does not support any inference that the state knowingly used false testimony or knowingly allowed false testimony to go uncorrected. The only counts of the Indictment that occurred in 2012 were Count I December 8, 2012, Kelly Harding and Count VIII, August 2, 2012, Kim McBride. The jury found Garn not guilty of Count I. The state dismissed Count VIII before trial. (4PCR T. at 544). Count VII concerning Jamie Wood was likewise dismissed by the state prior to trial. (4PCR T. at 544). Based upon the evidence presented at trial, the jury found Garn guilty of Count XI a LEADS violation involving Mike Napier. (9T. at 1305; 11T. at 1414). *See, Garn, I* at ¶6; ¶33.

[*P102]  Garn's Exhibits Fourteen and Fifteen do not support any inference that the state knowingly used false testimony or knowingly allowed false testimony to go uncorrected. Garn was never indicted or tried on any allegation concerning Allie Silliman. The state did in fact dismiss the count concerning Jamie Woods before trial.

*State v. Garn*, 2019-Ohio-1604, ¶¶101-02.

The Ohio appellate court did not reach a conclusion based on an unreasonable application of clearly established federal law when it determined that the State did not commit a *Brady* violation. In fact, the Ohio appellate court reasonably determined that "[t]he evidence as presented by Garn cannot reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict." *State v. Garn*, 2019-Ohio-1604, ¶89. Garn has not made an adequate showing regarding how the two STEP logs were material or exculpatory. And entirely absent from Garn's argument is how this alleged suppression would be material.

While Garn focuses his arguments on what the STEP logs would have shown, he fails to substantively address the state appellate court's finding that the State dismissed the LEADS violation charge against Garn relating to Ms.McBride. Further, he fails to address the fact that he was found not guilty for the other LEADS charge relating to Ms. Harding. While Garn argues that the State committed a *Brady* violation by continuing to prosecute his charge for 15 months, he provides no case law to demonstrate how this assertion is relevant to his *Brady* claim. Further, his assertion completely overlooks the state court's finding addressing this specific contention: that any delay in dismissing the counts was attributable to the number of attorneys working on the case at any given time. Significantly, Garn offers no facts to rebut the state appellate court's factual conclusion. Because Garn has failed to demonstrate how this evidence would put his whole case in such a different light as to undermine confidence in the verdict, this claim should be rejected.

The Ohio appellate court also did not reach a conclusion based on an unreasonable application of clearly established federal law in concluding that there was no *Napue* violation. Under *Napue*, the Supreme Court held that "a State may not knowingly use false evidence, including false testimony to obtain a tainted conviction," including false impeachment testimony. *Napue*, 360 U.S. at 269. To demonstrate a denial of due process concerning the prosecution's elicitation of perjured testimony, a defendant must show that the testimony was false and material, and that the prosecution knew that the testimony was false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998).

Here, as held by the Ohio appellate court, Garn failed to demonstrate that Exhibits Eleven, Twelve, and Thirteen supported an inference that the State knowingly used false testimony or knowingly allowed false testimony to go uncorrected. The only 2012 counts related to Ms. Harding and Ms. McBride. The State dismissed the charge relating to Ms. McBride prior to trial, and a jury found Garn not guilty for the charge relating to Ms. Harding.

Further, Garn has not demonstrated how Exhibits Fourteen and Fifteen also support an inference that the state knowingly used false testimony or knowingly allowed false testimony to go uncorrected. Garn was not indicted or tried on any allegation concerning Allie Silliman, and the State dismissed the count regarding Jamie Woods before trial. To the extent that Garn attempts to establish bad faith because the prosecution did not dismiss the charge until 15 months later, he has not rebutted the Ohio appellate court's finding (discussed previously herein) that this was attributable to the number of attorneys working on the case. In sum, Garn failed to show how the state appellate court's determination was an unreasonable application of clearly established federal law. Accordingly, I recommend that the Court reject this sub-claim.

### 6. Exhibit Nine – Rich Miller Report

Garn's next sub-claim is that Exhibit Nine, a police report authored by Rich Miller that indicated that Ashley Matthews ("Matthews" or "Ms. Matthews") made a false prior sexual assault allegation, constituted a *Brady* violation. (ECF Doc. 1-2, PageID#67). Garn acknowledges that he was acquitted on counts related to Ms. Matthews. (*Id.* at 67-68). Yet, he asserts that this court must consider the aggregate effect of this non-disclosure. (*Id.* at 68). He contends that multiple allegations had a cumulative effective in rendering Garn's convictions. (*Id.*). He points to the State's closing statement as evidence that the cumulative effect of multiple alleged victims bolstered the statements of each victim. (*Id.*). He argues that "had the jury heard a testimony that

at least one of the alleged victims had a history of fabricating allegations of sexual assault, there is a reasonable probability that [the] outcome of the trial would have been different." (*Id.* at 68-69).

The Ohio Court of Appeals stated the following on this issue:

*4). Exhibit Nine — Summary prepared by Officer Rich Miller dated August 25, 2014.*

[*P68]  Exhibit Nine is one typewritten page. It is on plain white paper without a letterhead. It does not contain a signature. It does not contain a verification. It was authored by Officer Rich Miller and dated August 25, 2014.

[*P69]  Exhibit Nine discusses a complaint between Ashley Matthews and a doctor. In the document, it is noted that Ashley Matthews accused the doctor of trading sex for prescription medications and alleged that the doctor was as corrupt as Garn. Officer Miller documents that Matthews alleged that Garn had taken heroin and hidden it from her or on her in an effort to coerce her into having sex with him.

*a)). Garn's arguments concerning Exhibit Nine*.

[*P70]  Concerning Exhibit Nine, Garn contends, "the state's failure to disclose evidence related to these charges undermines confidence in the outcome of the trial as a whole. The state was in possession of, and failed to produce, evidence that the Matthews had made similar sexual allegations against a Doctor, which were unfounded. A police report containing the same information was provided through a public records request but not provided prior to trial. MPD Officer Rich Miller testified that he drafted the complaint and turned it over, up the chain of command. (PC Tr. at 422-426)." *Merit Brief For Appellant*, filed Nov. 20. 2018 at 13.

*b)). Competent, credible evidence supports the trial court's decision that non-disclosure of Exhibit Nine did not violate Garn's due process rights to a fair trial; the evidence cannot reasonable be taken to put the whole case in such a different light as to undermine confidence in the verdict*.

[*P71]  The jury found Garn not guilty of all counts relating to Ashley Matthews. It would be mere speculation that Garn's Exhibit Nine would have had any effect on the remaining charges unrelated to Matthews. It is also speculative as to whether this evidence would have been admissible at his trial.

[*P72]  We note Garn's re-trial on the Matthews allegations would be barred by the principles of Double Jeopardy, the jury having found him not guilty. Therefore,

on any re-trial of the remaining charges, Garn's Exhibit Nine would not be admissible.

 [*P73]  Accordingly, based upon the foregoing, the trial court did not abuse its discretion in finding that the state's failure to disclose the evidence set forth in Garn's Exhibit Nine and presented at the evidentiary hearing was not a *Brady* violation. The evidence as presented by Garn cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. The jury found Garn not guilty with respect to all counts involving Ashley Matthews.

 [*P74]  Garn was not denied his right to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

*State v. Garn*, 2019-Ohio-1604, ¶¶ 68-74.

The Ohio Court of Appeals did not reach a conclusion based on an unreasonable application of clearly established federal law. As noted by the state appellate court and acknowledged by Garn, he was found not guilty of all counts related to Ms.  Matthews. Indeed, a re-trial on Ms. Matthews's allegations would be barred by the principles of Double Jeopardy, making this evidence inadmissible. Here, Garn offers only a snippet of the State's closing argument and mere speculation that the introduction of Ms. Matthews's allegations—despite its likely inadmissibility—would have a "cumulative effect" on the other multiple allegations that were wholly unrelated to Ms. Matthews. *See, e.g., United States v. Aleman*, 548 F.3d 1158, 1164 ("[The defendant] only speculates that interviews of [the undisclosed] individuals would have provided evidence favorable to his defense, however, and mere speculation is not sufficient to sustain a *Brady* claim." (internal ellipses and quotation marks omitted)). Thus, Garn has failed to establish how the Rich Miller report would have been material or exculpatory. Accordingly, I recommend that the Court reject this sub-claim.

## D.  Ground Four: Ineffective Assistance of Trial Counsel

Garn's Ground Four claim in his merits brief asserts that his "trial counsel [was] ineffective for failing to investigate Brady Vance, who was listed on the State's witness list." (ECF Doc. 1-2, PageID#69). In response, the State contends that Garn's claim is procedurally defaulted because he failed to fairly present this claim to the Ohio Supreme Court on discretionary review. (ECF Doc. 7, PageID#100-01).  Alternatively, the State argues that the appellate court reasonably rejected this claim in Garn's post-conviction petition, and that this determination is entitled to AEDPA deference. (*Id.* at 143-51). Garn later concedes in his traverse that this claim is in fact procedurally defaulted. (ECF Doc. 14, PageID#2967).

Because both parties agree this claim is procedurally defaulted, no extensive analysis is required. Indeed, the record is clear that this claim was in fact procedurally defaulted because Garn did not raise to the Ohio Supreme Court in his appeal of his post-conviction petition. Accordingly, I recommend that the Court deny and/or dismiss Garn's ineffective assistance of trial counsel claim because it is procedurally defaulted.

### E.  Ground Five: Cumulative Error

In his fifth ground for relief, Garn asserts that the "combination of errors by the trial court, the prosecution, and the ineffectiveness of the defense counsel deprived [him] of a fair trial." (ECF Doc. 1-2, PageID#71). He acknowledges that the United States Supreme Court has not yet addressed whether a cumulative error claim may be addressed in a post-AEDPA claim, but contends that there is pre-AEDPA precedent. (*Id.*). Specifically, he points to *Chambers v. Mississippi*, 410 U.S. 284, 298 (1983), as support that courts are required to conduct a cumulative analysis of all claims to evaluate whether a petitioner was denied a fundamentally fair trial. Garn argues that the Court must look at the aggregate effect of his alleged *Brady* and *Napue* violations, the denial of his constitutional right to confrontation, and the unconstitutionality of

Ohio's LEADS statute. In response, the State contends that Garn's claim is not cognizable for federal habeas review. (ECF Doc. 7, PageID#151-52).

Garn's Ground Five claim is non-cognizable because the Sixth Circuit has held that "cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *see also Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005); *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011). Accordingly, I recommend that the Court dismiss Ground Five as not cognizable on federal habeas review.

## VII.    RECOMMENDATION REGARDING CERTIFICATE OF APPEABILITY

### A.  Legal Standard

As amended by AEDPA, 28 U.S.C. § 2253(c)(1) provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "[a] 'substantial showing' requires the applicant to 'demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further.'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996)).  The statute requires that certificates of appealability

specify which issues are appealable. 28 U.S.C. § 2253(c)(3).

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. "If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." *Id.*; *see also* 28 U.S.C. § 2253(c)(3) ("The certificate of appealability under [§ 2253(c)(1)] shall indicate which specific issue or issues satisfy the showing required by [§ 2253(c)(2)]."). In light of the Rule 11 requirement that the court either grant or deny the certificate of appealability at the time of its final adverse order, a recommendation regarding the certificate of appealability issue is included here.

## VIII.   Analysis

Garn has not made a substantial showing of a denial of a constitutional right for the reasons set forth above.  Because jurists of reason would not find these conclusions debatable, I recommend that no certificate of appealability issue in this case.

## IX.   RECOMMENDATION

For the foregoing reasons, I RECOMMEND that the Court DISMISS and/or DENY Garn's petition for a writ of habeas corpus under 28 U.S.C. § 2254.  I also recommend that the Court not grant him a certificate of appealability.

Dated:  February 13, 2023

*s/Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## X.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings,**

74

**recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79

(6th Cir. 2019).